OPINION OF THE COURT
Kaye, J.
Beginning in 1945, as the Long Island estate of Eversley Childs was divided into residential parcels, each deed within the tract (called Crane Neck Farm) included an identical covenant restricting buildings to “single family dwellings.” Respondent agencies, implementing a longstanding State policy to deinstitutionalize retarded per *157 sons and place them in community settings, in 1980 leased property within Crane Neck to house and care for eight severely retarded adults. Appellants, Crane Neck property owners, contending that this use violates the restrictive covenant, seek a judgment enforcing the covenant and enjoining continuation of the lease.
Special Term granted appellants partial summary judgment, concluding that the State facility was not a single-family dwelling and therefore violated the covenant, yet finding that there were fact issues as to whether the restrictions of the covenant had been waived by past violations and whether the character of the neighborhood had so changed as to render the covenant unenforceable in equity. The Appellate Division reversed and dismissed the complaint, determining that the facility could be considered a single-family dwelling consistent within the restrictive covenant, and that in any event the covenant could not be enforced to prevent the residence as a matter of public policy. On the latter ground, we affirm the order of the Appellate Division.
I
Pursuant to a lease effective September 1,1980 between the owners of the subject property (respondents Jonathan Pool and Bernard Grofman) and respondent New York City/Long Island County Services Group (an agency of respondent New York State Department of Mental Retardation and Developmental Disabilities), eight profoundly retarded adults formerly in institutions came to reside in a six-bedroom home situated on two wooded acres at 3 Johns Hollow Road in the Hamlet of Crane Neck, Village of Old Field. These adults were in need of uninterrupted supervision.
According to the State’s program, a nonresident professional staff of approximately 16 persons cares for the residents, trains them, and provides therapy where needed. While resident “houseparents”. are in theory part of the program, it is not clear from the record that there have in fact been houseparents at 3 Johns Hollow Road. At least three supervisory persons are to be within the home around the clock.
*158 In a family-type environment and under constant supervision, the disabled persons residing in Crane Neck are taught socialization as well as basic physical skills. Structured “day programming” lasting six or more hours a day is conducted in feeding, toilet training, personal grooming and health habits, dressing, housekeeping, and caring for property. After the initial period of intensive training, once sufficient independence is developed, the residents are enrolled in sheltered workshops in the area, such as the United Cerebral Palsy Center in Commack, the Industrial Home for the Blind in Melville, and the Suffolk Child Development Center in Smithtown, returning to 3 Johns Hollow Road each day. As they are able, also, they begin interacting with merchants and others in the neighborhood. The stays at 3 Johns Hollow are of indefinite duration, but it appears that residents upon reaching a certain degree of development are expected to leave and be replaced by others in need of care and training.
II
The question presented on this appeal is whether use of the leased premises at 3 Johns Hollow Road should be enjoined by equitable enforcement of the restrictive covenant in the lessors’ deed. Any analysis of this issue of course must begin with language of the covenant.
Starting in 1945, and continuing for about 10 years, uniform deed restrictions were imposed on all parcels comprising the tract of Crane Neck. Each of these deeds, including the deed from which respondent lessors derived title, included the following:
“Subject to the following covenants and restrictions, which shall be construed as real covenants running with the land and shall be binding upon and enure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, successors and assigns:
“(a) There shall not be constructed nor maintained upon the said premises, any buildings other than single family dwellings and outbuildings. That no house or dwelling costing less than $3500 on the basis of 1944 material and labor costs shall be erected on the said premises, and that no building other than Cape Cod or Colonial design and *159 architecture (and additional buildings shall conform in architecture to the main dwelling) shall be erected on said premises unless plans and specifications therefor have first been submitted to and approved in writing by the parties of the first part, or their duly authorized agent.”
From a reading of the covenant and the undisputed evidence regarding the intent of the grantor, we conclude that the deed restriction was imposed to preserve Crane Neck as a neighborhood of single-family dwellings, not only architecturally but also functionally. We are therefore in agreement with both courts below that, to give the effect intended by its creator, the covenant must be read to apply not only to the physical construction of single-family dwellings within Crane Neck but also to their actual use. (Baumert v Malkin, 235 NY 115.)
We cannot agree, however, with the conclusion of the Appellate Division that the community residence at 3 Johns Hollow Road functions as a single-family dwelling. It fits neither a traditional concept of a single-family unit known in 1945 (see What Constitutes a “Family” Within Meaning of Zoning Regulation or Restrictive Covenant, Ann., 172 ALR 1172), by which its use must be measured (Clark v Devoe, 124 NY 120, 123), nor even the expanded definitions of “family” of more recent origin (see City of White Plains v Ferraioli, 34 NY2d 300, 306).
In support of their argument that the use is consonant with the covenant, respondent agencies point to the fact that the residence in theory functions as one housekeeping unit providing a homelike atmosphere for individuals who cannot remain in their natural families, meanwhile teaching them basic skills which will enable them to live independently. But these indicia of family life do not create a family.
We found in City of White Plains v Ferraioli (34 NY2d 300, supra) that a group home consisting of a married couple, their two children and 10 foster children qualified as a family for purposes of a zoning ordinance, and in Group House of Port Washington v Board of Zoning & Appeals (45 NY2d 266, 271), we concluded that a group home of seven children with two surrogate parents could not be distinguished from a natural family for that same *160 purpose. Those decisions, which have in effect been codified in subdivision (f) of section 41.34 of the Mental Hygiene Law, are not controlling here. This case concerns the application of a private covenant, not a zoning ordinance. Furthermore, a much different factual situation is presented.
In this context, a home inhabited by eight unrelated adults each receiving uninterrupted professional supervision and care is not a single-family unit. The residents are, twice outnumbered by a changing, nonresident staff of nurses, physical and recreational therapists, dieticians and others finding no equivalent in a biologically unitary family, or indeed in any expanded concept of the word “family.” While neither the size of the resident group nor the nature of its daily activities would necessarily determine the issue (see Incorporated Vil. of Freeport v Association for Help of Retarded Children, 94 Misc 2d 1048, 1049, affd 60 AD2d 644), the absence of regular houseparents and, most significantly, the presence of a large complement of nonresident professional attendants distinguish the residence at 3 Johns Hollow Road from a single-family unit.
The residence being operated by respondent agencies within Crane Neck, then, cannot be considered a single-family dwelling as contemplated by the deed restriction.
Ill
But even if use of the property violates the restrictive covenant, that covenant cannot be equitably enforced because to do so would contravene a long-standing public policy favoring the establishment of such residences for the mentally disabled.[1]
Over the past three decades this State has developed a policy favoring the deinstitutionalization of mentally and developmentally disabled persons, and their placement in supervised residences housing small groups, called “community residences” (Mental Hygiene Law, § 1.03, subd 28).[2] The Mental Hygiene Law authorizes the Commissioner of Mental Retardation and Developmental Disabili *161 ties to operate these residences (Mental Hygiene Law, § 41.33), and provides for grants and reimbursements to others who offer such services (Mental Hygiene Law, §§41.36, 41.37, 41.38).
The first steps toward community orientation in the provision of services to the mentally disabled came in 1954 when the Legislature established community mental health boards in order to develop and improve community treatment services, a program described by Governor Dewey, in approving the legislation, as one that “offers a unique opportunity to reclaim the productive value of men and women who might otherwise spend their days within the walls of a mental institution.” (L 1954, ch 10; McKinney’s Session Laws of NY, 1954, p 1372.) In 1967, the Mental Hygiene Law and Private Housing Finance Law were amended to direct the commissioner to acquire or construct “community residential facilities to be operated as hostels for the mentally retarded” and to grant financial assistance to public or private nonprofit organizations for acquisition and construction of such facilities. (L 1967, ch 576.) Governor Rockefeller observed at the time that these community residences allow “the mildly retarded person [to] lead a reasonably full life in dignity, self-support and self respect” and not “to be committed to almost complete dependency in a State institution.” (McKinney’s Session Laws of NY, 1967, p 1531.)
While the community residence program was at first directed to placement of mildly retarded persons, in 1975 Governor Carey pledged this State to a major program of deinstitutionalization of more severely disabled persons, such as those involved in this action, in the consent decree issued in New York State Assn. for Retarded Children v Carey (393 F Supp 715). In 1978, the Department of Mental Hygiene issued a five-year plan for community placement and support of the chronically mentally ill, stating that “[t]he needs of the chronically mentally ill are now better understood and appropriate community support alternatives to institution have been identified; every effort should be made to provide what has been found to be needed.” (New York State Dept of Mental Hygiene, Division of Mental Health, “Appropriate Community Place *162 ment and Support: Phase One, Five Year Mental Health Plan,” p ii [Jan., 1978].)
The State policy was further reaffirmed by the passage in 1978 of what has come to be known as the “Padavan Law” (L 1978, ch 468, codified in Mental Hygiene Law, § 41.34), which established site selection procedures for community residences. As the Legislature declared: “It is the intention of this legislation to meet the needs of the mentally disabled in New York state by providing, wherever possible, that such persons remain in normal community settings, receiving such treatment, care, rehabilitation and education as may be appropriate to each individual.” (L 1978, ch 468, § 1.) This policy statement was echoed by Governor Carey in approving the bill:
“The national movement towards providing care and treatment for the mentally disabled in the least restrictive environment consistent with their needs has generated a great demand for community residential facilities for persons formerly served in State institutions.
* * *
“These bills clearly comprise the most important mental hygiene legislation of this session. It is my earnest hope that they will assist the State government, acting through its various agencies, to forge a new partnership with local governments, consumers and providers in developing the type of network of community services that was envisioned when this nation moved away from the back wards and towards the least restrictive environment.” (McKinney’s Session Laws of NY, 1978, pp 1821-1822.)
In approving another bill passed in 1980 providing funding for more community residences (L 1980, ch 809, codified in Mental Hygiene Law, § 41.36), Governor Carey reiterated that “residential services are essential to the State’s efforts to end inappropriate placement of mentally disabled persons in large institutions and to provide homes for mentally disabled persons who have never been institutionalized.” (McKinney’s Session Laws of NY, 1980, p 1907.)
As late as last month, Governor Cuomo stressed in his message to the Legislature that the State remains dedicated to a program of deinstitutionalization and placement *163 of mentally disabled persons in community residences, and that “additional efforts are required to ensure the availability of structured residential settings for all individuals unable to function independently in the community.” (Message to Legislature, pp 49-50 [Jan. 4, 1984].)
Thus, the consistent, unequivocal legislative and executive pronouncements over the past 30 years leave no doubt that it is an important State policy to deinstitutionalize mentally and developmentally retarded individuals, and to house and teach them in “community residences” such as the one now maintained at 3 Johns Hollow Road, in Crane Neck.
Even more directly pertinent to the present issues is the enactment of subdivision (f) of section 41.34 of the Mental Hygiene Law. Section 41.34 was added to the Mental Hygiene Law in 1978 to provide for a fair distribution of community residences and to bring municipalities into the process of site selection, thereby minimizing resistance and avoiding legal battles that had impeded the community residence program.[3] The latter concern was a very real one as attempts to develop community residences and similar group homes in some areas had met with resistance in the form of injunctive actions based upon local ordinances limiting the use of property to single-family residences.[4] In an effort to keep such legal challenges from frustrating the program, the Legislature provided as follows in the concluding subdivision of section 41.34 of the Mental Hygiene Law: “(f) A community residence established pursuant to this section and family care homes shall be deemed a family unit, for purposes of local laws and ordinances.”
*164 While the statute is limited to local laws and ordinances, this provision cannot be read without reference to the purpose that engendered it. A major purpose of section 41.34, and the very purpose for which subdivision (f) was enacted, was to eliminate the legal challenges that were impeding implementation of the State policy. (See Zubli v Community Mainstreaming Assn., 102 Misc 2d 320, 327, affd 74 AD2d 624, mod on other grounds 50 NY2d 1024.) The concern, as evident in the letters and memoranda contained in the Governor’s bill jacket, was to put an end to disruptive litigation over the location of community residences within “family” housing zones. In approving the bill that became section 41.34, Governor Carey stated that: “[T]he bill aims to facilitate the establishment of community residences by discouraging frivolous legal challenges that have needlessly delayed proper establishment of such facilities in the past, at great cost to the litigants. This legislation attempts to encourage a process of joint discussion and accommodation between the providers of care and services to the mentally disabled and representatives of the community, rather than legal antagonism.” (McKinney’s Session Laws of NY, 1978, p 1821.)
The fact that subdivision (f) speaks of “local laws and ordinances” thus reflects only the particular grounds that historically had been invoked to block placement of community residences, and not a deliberate substantive limitation by the Legislature. Private covenants restricting the use of property to single-family dwellings pose the same deterrent to the effective implementation of the State policy as the local laws and ordinances that had actually been the subject of the legal challenges. Given the avowed purpose of this law, we conclude that the Legislature did not enact subdivision (f) to erase the impediment resulting from single-family requirements found in laws and ordinances while leaving it intact in private covenants, and that the subdivision applies to such deed restrictions as well.
The legislative intent to remove barriers based on “family” restrictions, whether contained in local laws, ordinances or private covenants, is further illuminated by a comprehensive report issued on the heels of adoption of *165 section 41.34 by the Senate Mental Hygiene and Addiction Control Committee, and authored by its chairman, Senator Frank Padavan, for whom the law is named. (New York State Mental Hygiene and Addiction Control Committee, “Site Selection of Community Residences for the Mentally Disabled: Historical Perspective and Legislation” [April, 1979].) In a section entitled “Zoning and Legal Issues,” it is explained that many methods of litigation have been used by communities to block the establishment of such community residences and that, because of their availability, “special use permits and restrictive zoning ordinances have become the most relied upon method.” {Id., pp 25-26.) Such litigation frustrates the State’s program:
“Selection of community residence sites have often followed ‘the path of the least resistance’.
* * *
“The fact that some neighborhoods have a relatively high concentration of community residents is unfair to those neighborhoods who have been chosen to carry the weight of the community’s responsibility for the mentally disabled. It is equally counter productive to the goals of community care movement which strives for ‘normal settings’ and not mental hygiene ghettos that act as little more than mini-institutions. Furthermore, community residence sites that are inappropriate to the residents are selected in commercial zones when housing in ‘transitional neighborhoods’ is not available.” {Id., pp 26-27.)
After examining the cases that had been brought to enjoin the placement of group homes — all of which were, like Ferraioli, based upon local laws and ordinances — the committee stated that “with this legal climate in mind,” it had drafted legislation with an aim “to lessen the amount of litigation involved in siting community residences.” {Id., p 31.) As the committee explained
“Regardless of the source of the suits, they served only to polarize the community, spend taxpayers’ money and delay the inevitable location of the group home. This process was of little value to any of the interested parties.
“The end product was a bill, now law, which fully satisfied no single party of interest. It did, however, establish a *166 formal process involving community input and the right to suggest alternative sites. It also made clear the principle that any community residence established in accordance with its provisions would be deemed a single family unit, hopefully reducing litigation over this question.” {Id., p 32.)
It is clear from this report that, while the Legislature fixed on local laws and ordinances because those had been the source of prior legal challenges, the intention in adopting the legislation was to eliminate litigation “regardless of the source” by simply declaring a community residence to be a single-family unit.
Subdivision (f) “must be read with the legislative goal in mind so that * * * gaps in the law may be resolved in accordance with the legislative scheme.” (Matter of Pell v Coveney, 37 NY2d 494, 496.) The rule of construction that specific mention of one thing impliedly excludes others is not “anything more than an aid to construction and ‘must not be utilized to defeat the purpose of an enactment or to override the manifest legislative intent’ ”. (Matter of John P. v Whalen, 54 NY2d 89, 96.) The purpose and history of subdivision (f) establish that it was enacted to eliminate litigation adversely affecting the State’s program by challenging the “family” status of a community residence. In such circumstances, we must “construe the act in question so as to suppress the evil and advance the remedy.” (Matter of Sullivan Co. [Miller], 289 NY 110, 114.) ,
Since the State’s policy regarding placement of the mentally disabled as set forth in subdivision (f) would be frustrated by enforcement of the restrictive covenant, it cannot as a matter of public policy be enforced against the community residence at 3 Johns Hollow Road.
IV
Appellants urge that this court may not refuse to enjoin violation of the restrictive covenant on public policy grounds because it is a private contract which cannot be impaired by the State absent emergency circumstances not present here. (US Const, art I, § 10; Home Bldg. & Loan Assn. v Blaisdell, 290 US 398.)[5] Appellants’ argument, however, misconstrues the law.
*167 Although the language of the contract clause is facially absolute, this court has long recognized that the State’s interest in protecting the general good of the public through social welfare legislation is paramount to the interests of parties under private contracts, and the State may impair such contracts by subsequent legislation or regulation so long as it is reasonably necessary to further an important public purpose and the measures taken that impair the contract are reasonable and appropriate to effectuate that purpose. (Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth., 44 NY2d 101,109-112; Matter of Farrell v Drew, 19 NY2d 486, 493-494; Matter of Department of Bldgs. [Philco Realty Corp.], 14 NY2d 291, 297-298.)
While older cases such as Blaisdell (many of which concerned depression-era legislation prohibiting foreclosure of mortgages or other debts) may have suggested that some emergency requiring temporary State action should be present in order to allow impairment of contract rights, this is clearly no longer the law. “If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation * * * such as the remedying of a broad and general social or economic problem * * * Furthermore, since Blaisdell, the court has indicated that the public purpose need not be addressed to an emergency or temporary situation.” (Energy Reserves Group v Kansas Power & Light Co., 459 US 400,_, 74 L ed 569, 581; see, also, Allied Structural Steel Co. v Spannaus, 438 US 234, 249, n 24.)
Here the State’s interest in protecting the welfare of mentally and developmentally disabled individuals is clearly an important public purpose, and the means used to select the sites for community residences are reasonable and appropriate to effectuate the State’s program of providing the most effective care in the least restrictive environment. In such circumstances, appellants’ private contract rights may not override State policy.
*168 V
Since public policy prohibits enforcement of the restrictive covenant against the “community residence” at 3 Johns Hollow Road, appellants’ action seeking to enjoin such use was properly dismissed. Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Meyer concur; Judge Simons taking no part.
Order affirmed, with costs.

. In view of our holding, there is no need to reach the issue of waiver of the restrictive covenant, or what value if any it might have.

. An additional public policy regarding housing for mentally disabled individuals is expressed in subdivision 5 of section 296 of the Executive Law.

. (L 1978, ch 468, § 1.) Indeed, the parties to this litigation invoked the procedures provided by section 41.34 of the Mental Hygiene Law. Upon receiving notice of the site selection within Crane Neck, a public hearing was convened by the Village Trustees of Old Field, after which the village formally objected to the proposed community residence. Following a hearing conducted by the representative of respondent Department of Mental Retardation and Developmental Disabilities, the commissioner supported the decision to establish a community residence at 3 Johns Hollow Road, finding that the facility would not substantially alter the nature and character of the area. This decision was sustained in an article 78 proceeding brought by the village (Incorporated Vil. of Old Field v Introne, 81 AD2d 906), after which the lease was signed.

. (See, e.g., Little Neck Community Assn. v Working Organization for Retarded Children, 52 AD2d 90, mot for lv to app den 40 NY2d 803; and Incorporated Vil. of Freeport v Association for Help of Retarded Children, 94 Misc 2d 1048, affd 60 AD2d 644.)

. Although section 10 of article I is directed at legislative impairment, and mere impairment of an existing contract by a court order would not necessarily run afoul of *167 that constitutional prohibition (Barrows v Jackson, 346 US 249), where a court order is based on and gives force or effect to a legislative enactment, there is an impairment within the terms of the contract clause (Columbia Ry. v South Carolina, 261 US 236, 244-245).