*150 OPINION OF THE COURT
Beatrice S. Burstein, J.
This special proceeding brought pursuant to CPLR article 78 arises from community resistance to a decision by the Pilgrim Psychiatric Center (the Center) to proceed to open a community residence facility in New Hyde Park, an unincorporated area of the Town of North Hempstead (the Town), at a site known as 1652 Falmouth Avenue (the Falmouth site). For the reasons set forth below this proceeding is dismissed.*
In this petition the Board of Education of Sewanhaka Central High School District (Sewanhaka) seeks judgment annulling and setting aside the determination of respondent Commissioner, New York State Office of Mental Health (the Commissioner) regarding the Falmouth site, and essentially prohibiting him from taking any further steps leading to the development of a facility at that site. In response the Commissioner cross-moves, pursuant to CPLR 7804 (f), to dismiss this petition, on the ground it fails to state facts entitling petitioner to relief.
Petitioner sought a temporary restraining order, prohibiting respondents from purchasing the Falmouth site, preparing it, and issuing a certificate for its operation during the pendency of this proceeding. In his oral argument in opposition to the temporary relief sought, the Commissioner (by counsel) stated that the contract of sale for the Falmouth site would expire if he was temporarily stayed from purchasing it; that he was willing to risk a final determination barring its proposed use, even after purchase; that the Commissioner had not yet issued the required operating certificate for the facility and that in any event the facility would not be operational before 1990. This court concluded that that would be some time after this court had finally resolved the issues raised. Maintaining the status quo in this case would harm the State and was not necessary for petitioner’s ultimate protection. Therefore, the application for a temporary order was denied and this petition and cross motion were submitted.
An orderly resolution of the issues raised requires the court first to consider the Commissioner’s cross motion. For that sole purpose all of Sewanhaka’s factual allegations are *151 deemed true. (Matter of Burke v Sugarman, 35 NY2d 39, 42 [1974].)
Sewanhaka alleges as follows. On December 28, 1988 the Center wrote to the Town advising the Town of the Center’s intention to establish a community residence facility for mentally disabled adults at the Falmouth site, which is directly across the street and just a few hundred feet from the New Hyde Park Memorial High School, which serves students in grades 7 through 12. It is also near a town park. Both are a gathering place and "hang out” on weekends and after hours for youth from the community and New York City. The State failed to consider the proximity of the Falmouth site to the school and park, and no prior input had been sought from the school or the community. Twenty-six days later the Town, by its Presiding Supervisor John Kiernan, objected, on the ground that use of the Falmouth site could adversely affect the neighborhood because it was so close to the school and a town park. On the same date he advised New York State Senator Tully that, other than the letter to Kiernan, the State had not "done anything at all to inform the local residents” of the site selection.
This state of affairs continued until April 3, 1989, when the president of the local parent-teacher-student association (PTSA) advised the school principal of "a rumor” about the proposed use of the Falmouth site. Kiernan confirmed the rumor as fact to the principal.
The principal and the PTSA president arranged for two informational meetings, which were conducted by representatives of the State just 28 days later. Some 700 residents attended the evening meeting. All community speakers opposed the particular site selected, the majority emphasizing "poor judgment” by the State in choosing to place the facility opposite the school, many expressing "shock and dismay” that the Town and the State had never informed them of the proposal, and offering to help find an alternate site within the community.
The State’s representatives refused to detail the general diagnosis levels of the prospective residents. They did reveal that the contract of sale had been entered into in November 1988 (before notice to the Town), that the State expected to take title to the property within three weeks of May 1, 1989, that a final determination to open the facility had been made, that there would be only one State employee on duty at a *152 time, that the most important factor in site selection was the size of the house, and that access to transportation and shopping were also considered, and supported the site selection. In fact, Sewanhaka states, there is only limited access from, the Falmouth site to transportation, and the nearest shopping area is a considerable distance away.
Sewanhaka further alleges that the location of the facility at the Falmouth site will create an inherently dangerous situation, which will place an unnecessary supervisory burden upon the school, the State, the Town and Nassau County. Nevertheless, and despite the urging of the area’s State Assemblyman DiNapoli, Tully, and Kiernan in April and May of 1989, the Commissioner has not reconsidered his determination.
Sewanhaka contends the Commissioner failed to contact the school or community groups, and ignored the site’s proximity to the school and its lack of access to transportation and shopping. These omissions, it asserts, were contrary to the express intent of the Padavan Law (Mental Hygiene Law § 41.34), which was to foster communication between State and local agencies and local communities by establishing clearly defined procedures for site selection. Sewanhaka further claims that the Commissioner’s determination to purchase and his entry into a binding contract for the sale of the Falmouth site evidence arbitrary and capricious actions.
Sewanhaka concedes that the State properly did notify the Town of the State’s intention to establish a community residence facility at the Falmouth site. However, it contends that in keeping with legislative intent the Padavan Law "should be read” to require similar notice to a school district which will be clearly impacted by the location of such a facility, as Sewanhaka will in this case. It argues that absence of such notice here and the "unduly short notice” to the Town deprived Sewanhaka of due process of law.
There is no support for petitioner’s claim that it was or should be entitled to notice of the Center’s intention to establish the proposed facility. The plain and unambiguous language of the Padavan Law governs its interpretation. (See, Matter of Shannon v Introne, 53 NY2d 929 [1981].) The statute clearly states that notice must be given to the "chief executive officer of the municipality”, which petitioner concedes was done. (Mental Hygiene Law § 41.34 [c].) It does not require notice to anyone else.
*153 Furthermore, to read the statute as petitioner urges would be unwise. Sponsoring agencies such as the Center, who are the ones required to give notice to the municipality (Mental Hygiene Law § 41.34 [c]), would have no concrete guidelines and would always be faced with the question of when notice to a school district was required and when it was not. A wrong evaluation (or even a correct one) could give rise to litigation, and delay, as has occurred here.
The reading urged by petitioner also would encourage if not require sponsoring agencies to approach local citizens groups or local institutions independently, going "over the heads” of local governing bodies elected by those citizens, creating chaos. In both cases the result would be antithetical to one of the purposes for which the Padavan Law was enacted, to wit: to avoid needless delay caused by frivolous litigation. (Governor’s mem, 1978 McKinney’s Session Laws of NY, at 1821.)
With respect to due process, the statutory scheme provides for notice to the elected representative of the people. It provides for the holding of a public hearing at the discretion of that representative, even before a response to the sponsoring agency is required. (Mental Hygiene Law § 41.34 [c] [2].) It also affords the municipality an opportunity to object on limited grounds to the establishment of the facility of the kind proposed, or to object only to the particular site selected, and to suggest alternate sites. (Mental Hygiene Law § 41.34 [c] [1].) If agreement on site selection cannot be reached with the sponsoring agency the municipality has the right to an immediate hearing before the Commissioner (Mental Hygiene Law § 41.34 [c] [5]) and if displeased with that, a review of the Commissioner’s determination (Mental Hygiene Law § 41.34 [d]). Therefore, there is ample opportunity for the community to air its objections to any proposed facility (Incorporated Vil. of Old Field v Introne, 104 Misc 2d 122 [Sup Ct, Suffolk County 1980]) and to have a voice in the actual site selection.
Designating elected officials who are subject to the will of the people as those who will act for these citizens when the establishment of a community residence is at issue is in keeping with our democratic system. If petitioner was deprived of due process it was not due to the statutory scheme. The fact that Supervisor Kiernan decided not to hold a public meeting in this case rests in his discretion. He has made the same choice in the past. (See, Matter of Polo Park Civic Assn. v Kiernan, 133 AD2d 116, lv denied 70 NY2d 614 [1988].)
*154 Petitioner claims that the statute does not afford sufficient time for a municipality to hold a public hearing. This is belied by the fact that the principal and PTSA president set up two meetings within 28 days of their receiving notice, one of which drew some 700 people. Nothing in the statute prevents the municipality from contacting local groups such as petitioner to assist it in setting up and publicizing such a meeting. Furthermore, it is up to the Legislature, not this court, to resolve such a problem if there is one.
The statutory scheme and case law indicate that the balance of petitioner’s claims are reserved to the Town. This State has a long-standing policy of deinstitutionalizing mentally and developmentally retarded individuals, and housing them in facilities such as the one now at issue. (Crane Neck Assn. v New York City/Long Is. County Servs. Group, 61 NY2d 154, 163 [1984].) In keeping with this policy the Padavan Law (Mental Hygiene Law § 41.34) was enacted by the Legislature, "to meet the needs of the mentally disabled * * * by providing * * * that such persons remain in normal community settings * * *. It is further intended that communication and cooperation between the various state agencies, local agencies and local communities * * * will be best achieved by establishment of clearly defined procedures for the selection of locations for community residences”. (L 1978, ch 468, § 1 [emphasis supplied].) As stated above, these procedures were designed to avoid needless delay.
The procedure to be followed pursuant to the Padavan Law is clear. Although set forth in part above, it bears repeating here. The sponsoring agency, in this case the Center, must give notice to the municipality, here the Town, of the proposed program. The municipality then has 40 days to act, approving the selected site, or suggesting alternate sites within its jurisdiction or objecting to the program on the ground the municipality is oversaturated with such or similar facilities. There are no other grounds for review provided in the statute. The municipality may, at its option, hold a public hearing prior to responding to the proposed program. If the municipality complains of oversaturation or, if after alternate sites have been reviewed, the agency and the municipality cannot agree on an alternate site, the statute requires that the municipality’s objection be reviewed by the Commissioner, whose determination is then reviewable by a proceeding brought pursuant to CPLR article 78 (Zubli v Community Mainstreamim Assocs., 102 Misc 2d 320, 326, affd for reasons *155 stated in opn of Young, J., at Spec Term 74 AD2d 624 [2d Dept 1980], mod on other grounds and as mod affd for reasons stated in opn of Young, J. 50 NY2d 1024 [1980]; see, Crane Neck Assn. v New York City/Long Is. County Servs. Group, 61 NY2d 154, 163, n 3 [1984], supra; Community Bd. No. 3 v State of New York, Off. of Mental Retardation & Developmental Disabilities, 76 AD2d 851, 852 [2d Dept 1980] [when there is lack of agreement with respect to a proposed site, a formal "fact-finding” hearing shall be held before the Commissioner, pursuant to Mental Hygiene Law § 41.34 (c) (5)].) Therefore, as set forth in the related proceeding brought by the Town, the Town is precluded from judicial review until it exhausts its administrative remedies. (Martini v Rockefeller, 38 AD2d 858 [2d Dept 1972]; Matter of Scarsdale-Harney Corp. v Briante, 11 AD2d 777 [2d Dept 1960].) Certainly the Legislature did not intend petitioner to have a greater right than the Town in obtaining direct review on claims the Town cannot similarly raise. In fact, local groups cannot even require the municipality to seek a fact-finding hearing (Matter of Polo Park Civic Assn. v Kiernan, 133 AD2d 116, lv denied 70 NY2d 614 [1988], supra) and do not have standing to appeal to the Commissioner to request a fact-finding hearing on their own. (Town of Hempstead v Commissioner of State of N. Y. Off. of Mental Retardation & Developmental Disabilities, 119 AD2d 582 [2d Dept 1986].) They may seek review of the Commissioner’s determination after a hearing has been held. (Matter of Talisman Dr. Civic Assn. v Webb, 138 AD2d 610 [2d Dept 1988].)
There are other reasons petitioner cannot prevail insofar as it seeks to prohibit the Center or the State from acting. The decisions complained of are those of the executive branch of government. (See, Town of Oyster Bay v State of New York Off. of Mental Retardation & Developmental Disabilities, 115 AD2d 536 [2d Dept 1985].) An article 78 proceeding in the nature of prohibition will not issue against executive actions. (Matter of Schumer v Holtzman, 60 NY2d 46, 51 [1983].)
Finally, to the extent that the holding in Gedney Assn. v State of New York Dept. of Mental Hygiene (112 Misc 2d 209 [Sup Ct, Westchester County 1982]) is to the contrary, this court of concurrent jurisdiction is not bound by that determination. In holding that a civic association could raise substantive claims the court in Gedney relied upon Grasmere Homeowners’ Assn. v Introne (84 AD2d 778 [2d Dept 1981]). Grasmere is distinguishable. It involved the institution of a special proceeding to review a decision of the Commissioner after the *156 Commissioner had held a fact-finding hearing. Section 41.34 (d) specifically provides for such review, as does the previously cited case law. The statute, however, does not state that direct review by-passing the Commissioner may be had pursuant to an article 78 proceeding. Accordingly, this proceeding is dismissed.
This dismissal is without prejudice to any rights Sewanhaka may have to commence article 78 proceedings, if and when the Commissioner holds a fact-finding hearing and makes a determination with respect to the Falmouth site. (Mental Hygiene Law § 41.34 [d]; Matter of Talisman Dr. Civic Assn. v Webb, 138 AD2d 610 [2d Dept 1988] supra.) This court makes no determination with respect to whether, under the circumstances of this case, the Commissioner, if asked, is obligated to hold such a hearing.

 The same decision forms the basis for another special proceeding before this court brought by the Town of North Hempstead against the Center and the Commissioner of the New York State Office of Mental Health.