THE PEOPLE OF THE STATE OF NEW YORK, by ROBERT ABRAMS as Attorney-General of the State of New York, Respondent, v TOWN OF CLARKSTOWN, Appellant.

Second Department, July 18, 1990

APPEARANCES OF COUNSEL

*Murray N. Jacobson, Town Attorney,* for appellant.

*Robert Abrams, Attorney-General (Sanford M. Cohen* of counsel), for respondent.

### OPINION OF THE COURT

ROSENBLATT, J.

On July 8, 1986, the Town of Clarkstown in Rockland County amended its zoning ordinance to add certain requirements for family day-care homes. The issue in this appeal is whether the State Legislature has preempted the regulation of family day-care homes, thus rendering the town's amendment invalid. We hold that the State has preempted the field, and that accordingly, the amendment is invalid.

The facts underlying this appeal are as follows:

Town of Clarkstown Zoning Code § 106-10A (8), as amended July 8, 1986, contains the following "performance standards" relative to day-care homes:

"(a) A suitable, safe, fenced or other enclosed play area shall be provided, located not less than 50 ft. from any street line or 25 ft. to any lot line. The play area shall include at least 200

sq. ft. per child. No play area may be in any required front yard.

"(b) No building areas to be occupied by the children shall be within a required yard.

"(c) At least one off-street parking space shall be provided for each staff member, and at least one space per every three (3) enrolled children.

"(d) The family day care home shall be allowed only as accessory to a single-family detached residence. No family day care home shall be located on a lot that includes a two-family conversion.

"(e) All licensing requirements of the Department of Social Services shall be met. The Certificate of Occupancy shall automatically terminate upon sale of the premises, or if the Department of Social Services license is revoked.

"(f) No more than six (6) children shall be enrolled in the family day care home.

"(g) In keeping with the State Uniform Building Code applicable to Chapter F—Housing Maintenance for home occupation and for accessory use—the maximum floor area shall be no more than twenty-five (25%) percent of the total floor area of the dwelling unit and in no event more than five hundred (500) square feet of the floor area".

In addition, Town of Clarkstown Zoning Code § 106-3, as amended July 8, 1986, defines "family day care" as follows: "Day care in a family home shall mean day care of not more than six (6) children in a single-family detached residence". Moreover, the town requires compliance with the following fire safety regulations for family day-care homes: (1) space to meet building code and town housing standards, (2) two exits, (3) suitable hardware on exit doors, with no locking devices, (4) emergency lights, (5) a fire detection system throughout with bells and pullboxes, (6) portable fire extinguishers, of adequate number and size, and (7) a first-aid kit.

In September 1987 pursuant to Social Services Law § 390, the Rockland County Department of Social Services certified Jaclyn Lynam as a family day-care provider. Ms. Lynam provides day-care services in her home, which is also the home of her parents, Margaret and Walter Donne.

In October 1987 the Town of Clarkstown Building Inspector issued a notice to the Donnes, informing them that they were in violation of the Code of the Town of Clarkstown in that "No person, firm or corporation shall change the nature of

occupancy of a building without a building permit from the Building Inspector. To wit, having a family day care home in a single family residence". In November 1987 Margaret Donne received a criminal summons from the Justice Court of the Town of Clarkstown, charging her with "Building use change without a permit".

In December 1987 the State commenced this action by which, among other things, it sought a declaration that the town's zoning ordinance was preempted by State law. The State also sought to enjoin the town from enforcing its family day-care regulations, and from continuing to prosecute the Donnes for the operation of family day-care services in their home.

By order dated March 21, 1988, the Supreme Court (Stolarik, J.), granted the State's motion for a preliminary injunction, finding that the State had met its burden for such relief because "[w]ith respect to the likelihood of ultimate success on the merits the plaintiff has demonstrated convincingly that the New York State legislature has impliedly expressed its intention to pre-empt local regulation of state licensed family day care homes", that the State had shown irreparable injury in that "[a] denial of the application for injunctive relief would have a chilling effect upon the provision of child day care services throughout the State of New York" and "deprive the parents of the children who are presently in day care at 4 Aspen Court [the Donnes' residence] of necessary day care", and, further, that the equities were in favor of the State.

On May 3, 1988, the parties stipulated that "there are no disputed issues of material fact in need of resolution by trial with respect to plaintiffs' causes of action, and that the issues regarding plaintiffs' causes of action are questions of law". The parties agreed that the Supreme Court's decision granting the State a preliminary injunction would be deemed a decision in the State's favor on the merits of its causes of action, and judgment was entered in favor of the State. We affirm.

The municipal home rule law of the New York Constitution "directs the Legislature to provide for the creation and organization of local governments so as to secure the rights, powers, privileges and immunities granted by the Constitution" (Kamhi v Town of Yorktown, 74 NY2d 423, 428; see, NY Const, art IX, § 1). A local government can exercise its police power "only when and to the degree it has been delegated such lawmaking authority" (People v De Jesus, 54 NY2d 465, 468).

The State Constitution limits the police power of a local government by requiring that a local law be "not inconsistent with * * * any general law" (NY Const, art IX, § 2 [c] [i]), and that the legislative power of local government be limited "to the extent that the legislature shall restrict the adoption of such a local law" (NY Const, art IX, § 2 [c] [ii]).

Thus, a local law will be ruled invalid not only when it is inconsistent with the Constitution or any general law of the State, but also when the Legislature has preempted the field (see, *Jancyn Mfg. Corp. v County of Suffolk,* 71 NY2d 91, 96-97; *New York State Club Assn. v City of New York,* 69 NY2d 211, 217, affd 487 US 1). There need not be an express conflict between a State and a local law to render the local law invalid as "inconsistent". "Rather, inconsistency 'has been found where local laws prohibit what would have been permissible under State law or impose "prerequisite 'additional restrictions' " on rights under State law, so as to inhibit the operation of the State's general laws' " *(New York State Club Assn. v City of New York, supra,* at 217; see, *Jancyn Mfg. Corp. v County of Suffolk, supra,* at 97).

The preemption doctrine, a "fundamental limitation on home rule powers" *(Albany Area Bldrs. Assn. v Town of Guilderland,* 74 NY2d 372, 377), applies to invalidate local laws where "the State has demonstrated an intent to preempt an entire field and thereby preclude any further local regulation" *(Matter of Ardizzone v Elliott,* 75 NY2d 150, 155). There need not be an express pronouncement of the legislative intent to preempt. "It is enough that the Legislature has impliedly evinced its desire to do so and that desire may be inferred from a declaration of State policy by the Legislature or from the legislative enactment of a comprehensive and detailed regulatory scheme in a particular area" *(New York State Club Assn. v City of New York, supra,* at 217; see also, *Matter of Ardizzone v Elliott, supra,* at 155; *Jancyn Mfg. Corp. v County of Suffolk, supra,* at 98; *Dougal v County of Suffolk,* 102 AD2d 531, 532, affd 65 NY2d 668).

Social Services Law § 390 does not contain an express prohibition against local regulation of family day care. We find, however, that the State has evinced an intent to preempt the regulation of family day-care homes, and that the enforcement of the town's family day-care regulations "would tend to inhibit the operation of the State's general law and thereby thwart the operation of the State's overriding policy concerns" *(Jancyn Mfg. Corp. v County of Suffolk, supra,* at 97).

There is an extensive body of research and writing demonstrating that because of the economic stresses placed on families, especially mothers, the need for child care is increasing. Today, it is recognized that "mothers' employment and their earnings are not a luxury. They are essential to maintain an adequate standard of living or simply to escape poverty. For many employers, women with children comprise a significant and growing component of their work force" (Hayes, Who Cares for America's Children, at 9).[1]

Indeed, as early as 1969, the New York State Legislature recognized the serious shortage of child-care facilities throughout New York State,[2] and declared its policy to encourage the provision of such facilities (see, Social Services Law § 410-d).[3] More recently, the Legislature found "that there is a growing need to expand the availability and accessibility of safe, affordable and quality day care services for children" (L 1985,

1. This document is a report prepared at the request of and with support from the United States Department of Health and Human Services, "to collect, integrate, and critically assess data and research that bears on these issues [surrounding the current system of child care in the United States]" (Hayes, Who Cares for America's Children, at vii [1990]).

2. Rockland County is no different from the rest of the State in that respect. As of October 1987 there were only 68 certified family day-care homes in all of Rockland County. According to Rockland County Department of Social Services sources, a survey of 13 Rockland County day-care centers revealed that 225 children, including 70 infants, were on waiting lists for admission. The experiences of Judy Plass and Rosemarie Barnes, who each have two children and rely upon Jaclyn Lynam to provide day-care services so that they can work, are illustrative of the problem. Ms. Plass had searched for over one year to find suitable day care for her children. Ms. Barnes located Jaclyn Lynam after searching, with the aid of her employer, for four months.

3. As originally enacted, Social Services Law former § 410-d provided:

"There is a serious shortage throughout the state of facilities suitable for use for the care of children of pre-school age and primary school age whose parents are unable to provide such care for all or a substantial part of the day or post-school day. Existing facilities are overcrowded with long waiting lists. Many such facilities are so located that they are not accessible to families in need of such services. The absence of adequate day care facilities is contrary to the interest of the people of the state, is detrimental to the health and welfare of the child and his parents and prevents the gainful employment of persons, who are otherwise qualified, because of the need to provide such care in their home during the day time hours.

"It is the purpose of this article to encourage the timely construction and equipment of such facilities with mortgage loan participation by the New York state housing finance agency. The provision of such facilities is hereby declared to be a public purpose which it is the policy of the state to encourage" (L 1969, ch 1013).

ch 804, § 1),[4] and enacted Social Services Law § 390-a "to explore, on a demonstration basis, alternative approaches to developing day care and to evaluate the effectiveness of these alternatives in accomplishing this purpose" (L 1985, ch 804, § 1).

That section authorized the New York State Department of Social Services to enter into contracts with organizations "to operate programs which will expand the availability of quality day care services on a demonstration basis" (Social Services Law former § 390-a [1]). The functions of the programs included, among other things, identifying community needs for day-care services, disseminating information to parents, agencies, and the public, establishing cooperative relationships between family day-care providers and other service providers, establishing programs for training and education, and generally measuring the nature and quality of services funded pursuant to the legislation. Following the receipt of an evaluation report pursuant to Laws of 1985 (ch 804, § 2, adding Social Services Law former § 390-a [8]), the Legislature enacted the current Social Services Law § 390, which sets forth the requirements necessary for an individual seeking to obtain certification to provide in-home day-care services.

In addition, pursuant to Social Services Law § 390, a comprehensive scheme of highly detailed family day-care regulations was enacted (see, 18 NYCRR part 417). Those regulations include provisions for the evaluation of the health and character of the applicant and all members of the household (see, 18 NYCRR 417.4 [a] [1], [3] [iii]), for an evaluation of the appli-

---

4. According to the Government report, the lack of adequate child care services keeps some women from taking income-producing jobs at all, despite dire economic needs, and inhibits others in their ability to pursue education or job training (Hayes, Who Cares for America's Children, at 34 [1990]) (hereinafter Hayes).

Current statistics show that in 1988, more than 72% of women with children between the ages of 6 and 13 were in the labor force (Hayes, at 18). Between 1970 and 1988, the proportion of women with children under six years of age who were in the work force, rose from 30 to 56% (Hayes, at 17).

Today, in New York State, there are said to be 364,000 children under the age of six who could use child care if it were available. However, there are currently fewer than 135,000 child-care slots available (Statewide Youth Advocacy, Inc., A Budget Agenda for Children, 1990-1991, at 33).

The demand for child-care services will continue to increase. "Straight-line projections of the proportion of children with mothers in the labor force suggest that by 2000 approximately 80 percent of school-age children and 70 percent of preschool-age children will have mothers who are working or looking for work outside their homes" (Hayes, at 39).

cant's fitness to care for children (see, 18 NYCRR 417.4 [a] [2]), setting requirements that the applicant prove training or the interest and ability to care for children (see, 18 NYCRR 417.4 [a] [3] [i]), that the applicant comply with specific requirements to provide "safe and suitable" premises for the comfort and care of the children (see, 18 NYCRR 417.5), that the applicant comply with specific procedures regarding the admission of children (see, 18 NYCRR 417.6), that the premises be kept clean and sanitary (see, 18 NYCRR 417.7), that suitable safety precautions be taken to "eliminate all conditions which may contribute or create a fire or safety hazard" (18 NYCRR 417.8 [a]), that standards regarding the health (see, 18 NYCRR 417.9), diet (see, 18 NYCRR 417.10), supervision (see, 18 NYCRR 417.11), and activities (see, 18 NYCRR 417.12) of the children be maintained, and that social services be provided (see, 18 NYCRR 417.13). To carry out these requirements, the supervision and enforcement of the regulations are placed under the aegis of the New York State Department of Social Services or an approved agency (see, 18 NYCRR 417.16).

The town contends that the State has not directly or impliedly preempted the regulation of family day care, because the regulations promulgated by the New York State Department of Social Services specifically provide for local participation in the regulatory process. The town refers to 18 NYCRR 417.3 (h), which requires "A statement from an appropriate official or authority that the dwelling meets standards for sanitation and safety where local fire, health and/or building code authorities require approval". The town's contention does not withstand analysis.

Although 18 NYCRR 417.3 (h) requires that an applicant for a certificate to provide in-home day care demonstrate that the residence complies with local health and safety regulations, it does not authorize a locality to treat State-regulated family day-care homes as a separate class of residences upon which it may impose distinct and onerous conditions. Rather, consistent with the State's policy to promote the greater availability of day-care homes, 18 NYCRR 417.3 (h) merely establishes an adequate means of insuring that ancillary concerns such as safety, fire, and health standards are met, unobtrusive to State goals, by allowing an applicant to satisfy the criteria otherwise applicable to all residences generally, or by proving that a valid certificate of occupancy had been issued on the premises as a residence (see, People v Halloran, Sup Ct, App Term, 9th and 10th Jud Dists, Feb. 6, 1987).

*Matter of Ibero-American Action League v Palma* (47 AD2d 998), relied upon by the town, does not support its position. In that case, a local zoning ordinance requiring the grant of a special exception for a proposed drug rehabilitation center was found not to conflict with the New York State Mental Hygiene Law which pertained to the establishment of such centers. Although in *Ibero-American* a State-enacted regulation, similar to the one at issue in our case, required compliance with local laws pertaining to health, welfare, and safety, the court specifically found that the Mental Hygiene Law "shows no clearly defined intent to pre-empt reasonable local regulation of the location and construction of these [drug rehabilitation] centers" *(Matter of Ibero-American Action League v Palma, supra,* at 998). Here, in contrast, we find that the local regulations overburden State law and are inconsistent with it in many respects.

For example, State law permits family day care for up to eight children *(see,* 18 NYCRR 417.1 [b]), while the town's ordinance limits such care to six children (Town of Clarkstown Zoning Code §§ 106-3, 106-10A [8] [f]). State law contains no proscription against providing day care in a two-family or multiple-family dwelling (and, indeed, seems to contemplate such a use) *(see,* Social Services Law § 390 [13] [d]), while the town limits the provision of family day care to single-family detached residences (Town of Clarkstown Zoning Code § 106-10A [8] [d]). State law does not contain requirements as to the amount of play area each child must have, while the town requires that a play area of at least 200 square feet per child be provided, that the play area must be located not less than 50 feet from any street line or 25 feet from any lot line, and that the play area not be in any required front yard (Town of Clarkstown Zoning Code § 106-10A [8] [a]). The State imposes no requirements as to off-street parking spaces for staff members, while the town requires that at least one off-street parking space be provided for each staff member, and that at least one space be provided for every three enrolled children (Town of Clarkstown Zoning Code § 106-10A [8] [c]). State law contains no restriction on the maximum floor area that can be used for family day care, while the town requires that the maximum floor area that can be used for family day care "shall be no more than twenty-five (25%) percent of the total floor area of the dwelling unit and in no event more than five hundred (500) square feet of the floor area" (Town of Clarkstown Zoning Code § 106-10A [8] [g]). Further, State law re-

quires that day-care homes be equipped with fire extinguishers, while the town requires fire extinguishers, emergency lights, and a fire detection system with bells and pullboxes.

The town's reliance upon *Matter of Unitarian Universalist Church v Shorten* (63 Misc 2d 978) is also misplaced. The main issue in that case was whether a local zoning ordinance requiring a special use permit for the establishment of a day-care center conflicted with State law regarding the establishment of day-care centers. The court held that the local ordinance was invalid, as it conflicted with the "clearly and strongly stated and restated", State legislative policy to promote the development of day-care services *(Matter of Unitarian Universalist Church v Shorten, supra, at 981).*[5] The court directed the local fire authority to inspect the building to meet the State requirement that the building be in compliance with local fire codes. The local fire authority had refused to inspect the building because no special use permit had been issued. There is no indication that the local fire ordinance in *Matter of Unitarian Universalist Church (supra)* imposed separate, burdensome requirements specifically upon day-care centers, such as those imposed in the case before us.

Although the town argues that its restrictive regulations are necessary to guarantee the safety of the children in day-care homes, the State has already made such provisions, and the town's additional regulations have the effect, if not the design, of undermining the development of home day-care services in the town.[6] Even assuming that a provider had a

---

**5.** Similarly, in *Abbott House v Village of Tarrytown* (34 AD2d 821, 822), a zoning ordinance was held void because it conflicted with and hinders an overriding State law and policy favoring the care of neglected and abandoned children *(see also, People v Bacon,* 133 Misc 2d 771 [zoning ordinance construed to permit in-home day care because not to do so would thwart the State's public policy regarding day-care services]).

**6.** It is not uncommon for localities to impose zoning restrictions, as here, to limit the development of licensed child-care homes. It has been observed that:

"Zoning and land use laws have been used to exclude child care services, especially family day care homes, from residential neighborhoods, where ironically they are by definition intended to operate in many states * * * Some communities have invoked occupation ordinances, which limit the use of space (especially outdoor space), restrict hiring home employees for child care purposes (other than to care only for the occupant's children), or prohibit operating any kind of business in the home. In addition, by establishing impossible conditions (e.g., requiring 10-foot masonry walls around the residential property, costly use permits, conditional use permit hearings), child care services are excluded de facto whether or not local ordinances explicitly prohibit operations.

home which met the town's yard size,[7] location, and parking requirements with respect to day-care homes, it is unlikely that many competent providers could afford the added costs attendant to the installation of the required fire safety regulations, which include a fire detection system with bells, pull-boxes, and an emergency lighting system.

The town argues that by virtue of an amendment in 1986 to Social Services Law § 390, which contains a restriction precluding localities from prohibiting group family day care in certain circumstances, the Legislature evinced its intent not to preempt the field of ordinary family day care. The amendment added a new subdivision, which provides:

"13. (a) A group family day care home shall mean a home wherein day care services are provided to up to ten children of all ages, including not more than four children under two years of age or up to twelve children where all of such children are over two years of age. A group family day care home may provide day care services to two additional children if such additional children are of school age and such children only receive services before or after school hours. * * *

"(d) Notwithstanding any other provision of law: for the purposes of this subdivision, no local government may prohibit use of a single family dwelling for group family day care where a permit for such use has been issued in accordance with regulations issued pursuant to this section; nor may any local government prohibit use for group family day care, of a multiple dwelling classified as fireproof or prohibit use for group family day care, of a dwelling unit located on the

---

"Building codes have similarly been used to restrict child care services in commercial spaces and residential areas * * *. They have also affected family day care providers who adapt residential spaces for child care. It is not uncommon for building codes and fire codes to be contradictory, which creates impossible problems for providers and takes months or even years to resolve through administrative and judicial processes. * * *

"One way to overcome such barriers is through state preemption laws" (Hayes, Who Cares for America's Children, at 185 [1990]).

7. That the town has mandated requirements so extreme as to cripple if not exclude the possibility of compliance, is illustrated by the Town's requirement that there be a 200-square-foot outdoor play area for each child. The State computes that if a Clarkstown residence in which family day care is provided is on a corner lot, the lot must be at least 10,000 square feet or 105 feet by 100 feet in size in order to comply with the ordinance, and that any other such residences must be on at least 8,500 square feet, or 85 feet by 100 feet in size, so that the town is restricting the provision of family day care to residences situated on lots 1½ to 2 times the size of the typical suburban lot. The town did not dispute those calculations.

ground floor of a multiple dwelling not classified as fireproof, where in either case a permit for such use has been issued in accordance with regulations adopted pursuant to this section and such use is otherwise permitted under state fire and safety standards (the state code) and under any other existing standard for permitted uses of the multiple dwelling" (L 1986, ch 875).

The town contends that if the Legislature intended to preempt regulation of the entire field of home day care, it would have made these restrictions on local regulations apply to all types of day-care facilities, not merely to group family day-care homes. The town also asserts that by enacting these restrictions, the Legislature demonstrated that it did not consider the enactment of the original section 390 of the Social Services Law as impliedly preempting the field, because if the field had been preempted, these restrictions would have been unnecessary.

■ These arguments are unpersuasive. It is more reasonable to find that the Legislature's enactment of Social Services Law § 390 (13) (d) does not indicate that it had previously abjured preemption, but, rather, suggests that the Legislature found that an express preemption in this instance would best serve its purposes. The State argues: "It simply defies logic to conclude that the Legislature decided to pre-empt local regulation of day care for up to twelve children in a residence, as is authorized in group family day care under section 390 (13) (a), yet believed that care in a residence for only six children was not insulated from restrictions that might vary from locale to locale. Such a conclusion is especially unwarranted where the Legislature one year earlier funded a program to educate local zoning officials of the pre-emptive effect of state law. *See,* S.S.L. § 390-b (2) (a) (vi)". We agree.

In *Crane Neck Assn. v New York City/Long Is. County Servs. Group* (61 NY2d 154, *cert denied* 469 US 804), relied upon by the State, the Court of Appeals addressed an analogous point. The issue was whether use of certain premises as a home for mentally disabled adults should be enjoined because a restrictive covenant on the property limited the use of the premises to a single-family dwelling. The Legislature had enacted an amendment to Mental Hygiene Law § 41.34, which provided that "(f) A community residence established pursuant to [Mental Hygiene Law § 41.34] and family care homes shall be deemed a family unit, for the purposes of local laws and ordinances". The legislation, however, made no mention of

private covenants. The Court of Appeals held that, by implication, private covenants fell within the reach of the statute, notwithstanding that the legislation made express provision only for local laws and ordinances *(see, Crane Neck Assn. v New York City/Long Is. County Servs. Group, supra,* at 163). The court stated:

"In approving the bill that became section 41.34, Governor Carey stated that: '[T]he bill aims to facilitate the establishment of community residences by discouraging frivolous legal challenges that have needlessly delayed proper establishment of such facilities in the past, at great cost to the litigants. This legislation attempts to encourage a process of joint discussion and accommodation between the providers of care and services to the mentally disabled and representatives of the community, rather than legal antagonism.' (McKinney's Session Laws of NY, 1978, p 1821.)

"The fact that subdivision (f) speaks of 'local laws and ordinances' thus reflects only the particular grounds that historically had been invoked to block placement of community residences, and not a deliberate substantive limitation by the Legislature. Private covenants restricting the use of property to single-family dwellings pose the same deterrent to the effective implementation of the State policy as the local laws and ordinances that had actually been the subject of the legal challenges" *(Crane Neck Assn. v New York City/Long Is. County Servs. Group, supra,* at 164).

The court concluded, therefore, that the Legislature did not enact Mental Hygiene Law § 41.34 (f) to merely remove the impediments resulting from single-family requirements found in local laws and ordinances, but to apply the restrictions in private covenants as well *(see, Crane Neck Assn. v New York City/Long Is. County Servs. Group, supra,* at 164).

Lastly, the Town cites *Matter of Frew Run Gravel Prods. v Town of Carroll* (71 NY2d 126), in support of its zoning authority over day-care homes. *Frew Run* does not support the town's contention. In *Frew Run,* the plaintiff had obtained a State permit to conduct mining operations in a district in which such mining was prohibited by the locality's zoning ordinance. The issue before the court was "whether the [New York State] Mined Land Reclamation Law was intended to preempt the provisions of a town zoning law establishing a zoning district where a sand and gravel operation is not a permitted use" *(Matter of Frew Run Gravel Prods. v Town of*

*Carroll, supra,* at 129). The State statute contained a provision that it "shall supersede all other state and local laws relating to the extractive mining industry; provided, however, that nothing in this title shall be construed to prevent any local government from enacting local zoning ordinances or other local laws which impose stricter mined land reclamation standards or requirements than those found herein" *(Matter of Frew Run Gravel Prods. v Town of Carroll, supra,* at 129). The court found that the zoning law establishing districts in which some mining operations were prohibited, was "the sort of local law contemplated by the Legislature in this supersession provision" *(Matter of Frew Run Gravel Prods. v Town of Carroll, supra,* at 131).

We note that the power of a locality to impose zoning restrictions is not absolute *(see,* 3 Ziegler, Rathkopf's Law of Zoning and Planning § 31.01 *et seq.; see also, Matter of Long v Adirondack Park Agency,* 76 NY2d 416). Moreover, the zoning ordinance in *Frew Run (supra),* contrary to the ordinance in the case before us, did not interfere with the State statutory goal, which, in that instance, was "to encourage the mining industry by the adoption of standard and uniform restrictions and regulations to replace the existing 'patchwork system of [local] ordinances' " *(Matter of Frew Run Gravel Prods. v Town of Carroll, supra,* at 132) and to meet environmental concerns by providing for the reclamation of mined lands.

Thus, the State in *Frew Run (supra)* expressly contemplated that the imposition of additional local restrictions would be consonant with and even advance the State's objective. In our case, however, the imposition of the proposed zoning restrictions to dictate regulation or placement of day-care facilities would surely impede and could easily destroy the stated and transcendent goal of expanding the availability of critically needed child-care facilities throughout the State.

Accordingly, the judgment of the Supreme Court is affirmed.

RUBIN, J. P., BALLETTA and MILLER, JJ., concur.

Ordered that the judgment is affirmed, with costs.