CITY OF PEEKSKILL, Plaintiff,

v.

REHABILITATION SUPPORT SERVICES, INC. et al., Defendants.

No. 92 Civ. 7845 (GLG).

United States District Court, S.D. New York.

Nov. 18, 1992.

---

William J. Florence, Corporate Counsel,
City of Peekskill, N.Y., for plaintiff.

Stein & Schonfeld, Garden City, N.Y. (Robert L. Schonfeld, of counsel), for defendant RSS.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Kathy S. Marks, Asst. U.S. Atty., New York City, for Federal defendants.

Robert Abrams, Atty. Gen. for the State of N.Y. by Yolanda Pizzarro, Asst. Atty. Gen., New York City, for State defendants.

## OPINION

GOETTEL, District Judge.

This case involves a harsh reality, and for many uncomfortable questions. The reality is that homelessness is a problem that has spilled out of America's major metropolises and now touches even the smallest communities. To complicate matters, the homeless have many different faces which mask a complex array of needs. The questions are how will we respond to the myriad of challenges they represent and how will we meet their divergent needs?

## I. FACTUAL BACKGROUND

Plaintiff City of Peekskill has brought suit to prevent the acquisition of three condominium units, each located in a different development situated within the City of Peekskill. Defendant Rehabilitation Support Services, Inc. ("RSS") wished to acquire the units as new locations for transitional housing for a total of nine homeless mentally disabled persons, three in each condominium unit.

RSS originally submitted an application to the United States Department of Urban Development ("HUD") for $522,141 in funding under the Transitional Housing component of the Supportive Housing Demonstration Program, 42 U.S.C. § 11381 et seq., in May 1991. Along with that application RSS submitted a certification from the Deputy Commissioner of Westchester County's Department of Planning that the proposed activities were consistent with the County's Comprehensive Homeless Assistance Plan ("CHAP").

In February 1992, RSS was informed by HUD that its application had received conditional funding approval. After the State Office of Mental Health ("OMH") advised RSS that it was withdrawing its funding commitment, RSS was advised by HUD that regulations permitted RSS to obtain a site different from the site identified in its original application. See 24 C.F.R. § 577.-405(a).

On July 24, 1992, RSS formally requested a site change identifying Peekskill, New York as the location of its proposed three two-bedroom condominium units. In its July application, RSS reduced its requested grant to $202,500. In September 1992, HUD informed RSS that the local government notification requirements still applied to RSS's application but that RSS could seek a waiver of the requirements.

OMH has already approved RSS's application and disbursed some $250,000 of its funds to RSS. Defendant RSS used this state money coupled with over $150,000 of its own funds to purchase two of the units, the unit at Hendrick Hills and the one at Society Hill.

Besides RSS and HUD, plaintiff has sued two HUD officials, the Commissioner of New York's Department of Mental Hygiene, the State of New York, and the United States. Plaintiff claims that the proposed project runs afoul of several state and federal laws and regulations. In particular, plaintiff contends that defendants have failed to complete an environmental review as mandated by federal and state law. The City also claims that defendants have not provided certain required documentation like a certificate of consistency with HUD-approved Comprehensive Homeless Assistance Plan, written notice to plaintiff of proposed use and site, and written statement that proposed use is not inconsistent with City's municipal goals and planning. Plaintiff also alleges that defendants have not demonstrated that the City needs additional transitional housing.

In short, the City maintains that defendants have tried to shortcut all notification to plaintiff. Plaintiff contends that because a large percentage of its population receives public assistance (and has little

political influence) and 17% of its housing stock already receives public assistance, defendants are trying to "dump" state mental patients on the City.

By Order To Show Cause, plaintiff is seeking a preliminary injunction to prevent defendants from acquiring the transitional housing units it plans to purchase. According to plaintiff, it will suffer irreparable harm by the increased demand for its municipal services, loss of value to other condominium units in same developments, decline in its tax base from departure of families and businesses, impairment of its comprehensive zoning plan, and adverse environmental effects.

## II. DISCUSSION

■ As plaintiff recognizes, with a public interest at stake, a stricter standard must be met in order for plaintiff to secure a preliminary injunction. To garner the issuance of a preliminary injunction, plaintiff must establish that (1) irreparable harm will result if no injunction issues and (2) a likelihood of success on the merits. *See La Plaza Defense League v. Kemp*, 742 F.Supp. 792 (S.D.N.Y.1990).

### A. The State Defendants

■ The New York state defendants contend that plaintiff's action against them is moot. Plaintiff recognizes that OMH has issued formal approval and disbursed its funds to RSS and that RSS had used these state funds to purchase two of the three units comprising its transitional housing project. However, plaintiff contends that OMH's approval issued pursuant to Article 41 of the Mental Hygiene Law failed to comply with the site selection process specified in § 41.34(c) of the law.

We disagree. As all parties recognize, OMH has disbursed all the state funds it intends to contribute to RSS's project. Those funds have already been used to purchase two of the three units comprising RSS's transitional housing project. Moreover, RSS which was not originally a named defendant in this action is not subject to the temporary restraining order now in effect. By its express terms, § 41.34

applies only to supportive living facilities with four or more residents up to a maximum of fourteen.

The transitional units proposed by RSS will each house only three mentally disabled persons. At oral argument, plaintiff argued that common sense dictates that these disabled residents will require 24-hour supervision by at least one health care professional thus raising the total number of residents to four and exposing RSS's proposal to the selection requirements of Article 41. The short answer to this point is that RSS's plan in its present form provides for only three residents in each condominium. Plaintiff having offered no evidence that the RSS units shall house more than three live-in residents has not met its burden of demonstrating a likelihood of success on the merits of this issue.

Indeed, OMH which approved RSS's funding request recognized that the three separate units will not have twenty-four hour on-site supervisory staff. *See* Meyer Affidavit ¶ 10 at 3. RSS has confirmed this position. *See* Schonfeld Reply Affidavit at ¶ 8. With no evidence of a fourth resident in any of the units, we find that RSS's proposed transitional housing does not qualify as "community residential facilit[ies] for the disabled" under § 41.34 of New York's Mental Hygiene Law. Therefore, we conclude that the action is moot as against the state defendants.

■ Plaintiff lastly argues that no mootness exists since the state must issue an operating certificate to RSS before it can commence operation of its transitional housing project. At oral argument, the state denied the need for such a certificate. Neither party has bothered to do anything more than raise this issue in the most cursory manner. We shall dispose of the issue in similar fashion. Section 31.02 of New York's Mental Hygiene Law requires an operating certificate for the operation of residential facilities. It provides that no provider of services shall engage in:

1. operation of a residential facility or institution, including a community residence, for the care, custody, or treatment of the mentally disabled; provided, how-

ever, that giving domestic care and comfort to a person in the home shall not constitute such an operation.

N.Y. Mental Hygiene Law § 31.02(a)(1) (McKinney 1988). We are not certain whether RSS's transitional housing units qualify as a residential facility under § 31.-02(a)(1) which would require an operating certificate.

Since RSS has represented to the court that each of the three units will house only three individuals, the units would not qualify as a "community residential facility" under § 41.34(a)(1). Whether a "community residential facility" was intended to mean the same thing as a "residential facility" or "community residence" under § 31.-02(a)(1) is unclear since the statute uses slightly different terms. Such a reading would seem reasonable.

For the moment, however, the application of § 31.02 is unclear, although given our conclusion regarding § 41.34(a)(1) we harbor serious doubts. Plaintiff has offered nothing to clarify the application of § 31.02 beyond one brief conclusory statement in its Reply Affirmation as to its applicability. *See* Florence Reply Affidavit at ¶ 3. Nor has plaintiff cited any authority supporting its position on § 31.02's applicability. Under these circumstances, we do not find any firm ground on which to conclude that the action against the state defendants is not moot. Plaintiff's likelihood of success appear slim on this issue.

As an aside, we note that § 41.34(d) provides that decisions by a state commissioner pursuant to Article 41 are reviewable in an Article 78 proceeding. To the extent any review of OMH's funding is still available, the statute specifically states that such review shall be sought in state court within thirty days of determination by the commissioner. *See* N.Y. Mental Hygiene Law § 41.34(d) (McKinney 1988). We therefore have grave doubts whether this court would be the proper forum for plaintiff's challenge to OMH's funding decision even were we to find it not moot.

### B. RSS and the HUD Defendants

We turn to the likelihood of plaintiff's success on the merits against RSS and the federal defendants, namely HUD and its officials. To the extent that RSS is still awaiting HUD approval of its transitional housing project, that aspect of plaintiff's action is certainly not moot. Defendants, however, argue that plaintiff's arguments regarding a failure by RSS to notify plaintiff of its plans are premature at best.

#### 1. *Ripeness*

■ When reviewing HUD's decision under the Administrative Procedure Act, we shall set aside its decision only if found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). In the case at bar, however, HUD has not yet rendered a decision on RSS's application for funding. Defendants argue that its is premature for plaintiff to challenge HUD's funding of the RSS project when the application is still pending. We might agree except that likelihood of HUD approval appears great (HUD had earlier conditionally approved RSS's application). On the advice of HUD's Regional Office for Region II, located in New York City, HUD's Central Office in Washington, D.C. approved the site change in September 1992.

Further, we recognize the Catch–22 facing the plaintiff. Defendants simultaneously argue that the state's approval and disbursement of funds to RSS makes the action against OMH moot while HUD's present indecision on RSS's funding application makes the action against HUD premature. At oral argument, HUD noted that it would take between two and four weeks after approval to finalize the disbursement of federal funds to RSS. In practice, this may be true but defendants pointed to nothing in the statute or regulations which guaranteed any lag time between approval and disbursement. Consequently, finding the action against the state moot and the action against HUD completely unripe risks placing plaintiff in a lose-lose situation, unable to secure any judicial review. We shall therefore address the merits of plaintiff's preliminary injunction motion against RSS, HUD, and its officials.

### 2. Local Government Approval & The Waiver Request

RSS was informed by HUD that, pursuant to 24 C.F.R. § 577.210(b)(9), it needed to secure a statement from the local government that the proposed use of the units and site was not inconsistent with any local plan to use the units and site. On October 2, 1992, RSS requested a waiver of § 577.210(b)(9) pursuant to 24 C.F.R. § 577.10, and that request has not been ruled upon by HUD yet. Plaintiff responds that the waiver provision is not available to RSS since it was enacted when RSS's application process began in 1991.

HUD, however, clearly believed that the waiver provision applied; it suggested that RSS could seek such a waiver. As near as the court can tell from the regulations, the waiver provision like the other sections of Subpart A of 24 C.F.R. § 577 was enacted in August 1990, long before RSS requested its waiver.

■ Furthermore, courts generally give substantial deference to an agency's interpretation of its own the regulations. *See Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). Plaintiff has offered nothing demonstrating that RSS's request for a waiver upon HUD's suggestion was "plainly erroneous or inconsistent with the regulation." *See United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Therefore, we do not find that RSS's waiver request runs contrary to the federal regulations on HUD funding of transitional housing projects for the homeless.

■ Plaintiff attempts to argue that the notice requirements incorporated into 24 C.F.R. § 577.210(b)(9) cannot be waived because the notice requirements are written into the Housing Assistance statute, 42 U.S.C. § 11381 *et seq.* The quick answer to plaintiff's contention is that 24 C.F.R. § 577.210(b)(9) which mandates a statement from the local government saying the proposal is not inconsistent with any planned use of the site is not written into the statute and therefore may be waived by HUD. Section 11393 of Title 42 details the application requirements. The only notice-oriented requirement specified involves a certification from the public official responsible for the CHAP. *See* 42 U.S.C. § 11384(a)(2)(E). Any argument that a waiver would constitute an abuse of HUD's discretion is at best premature since no decision on the waiver has been reached yet. We hold similarly for those arguments by plaintiff which focus on the criteria applied by HUD when rendering its decision.

■ As an aside, we note that plaintiff has actual notice of RSS's development plans as evidenced by this Order To Show Cause and the City's letter to HUD dated September 17, 1992 (together with lengthy submissions) objecting to the transitional housing project. In its letter, plaintiff erroneously characterized the facility as one for recovering drug addicts. Therefore, at this point we do not find a likelihood of success based on any failure to notify the City. If HUD declines to grant the waiver, defendants will be obligated to formally notify the City of its project as well as secure the necessary written statements under 24 C.F.R. §§ 577.210(b)(9) and (10).

Parenthetically, we do not see within these regulations any requirement that defendants specifically demonstrate that Peekskill itself needs additional transitional housing. As mentioned earlier, RSS does need a certification that the project is consistent with the county's CHAP. But the regulations make no provision for any finding of a specific need by the town in which the housing is to be located; any finding of need appears to be subsumed within the requirement that the ESG formula city or county state the project's consistency with its CHAP.

### 3. Municipal Plans

■ The City has also argued that the project has not been shown consistent with the City's municipal goals and planning. We presume this is an allusion to 24 C.F.R. § 577.210(b)(iii)(9) which requires an applicant to secure a written statement which

says that the proposed housing is "not inconsistent with any plan of the local government that may have an effect on the use of the structure or site." The City, however, has offered no evidence to show that it has any specific plans to use the three condominiums in question. The only "plan" regarding these units that Peekskill alludes to is its zoning ordinances.

Reading of the regulations, however, makes clear that § 577.210(b)(iii)(9) concerns plans by a local government that affect the proposed use of the transitional housing structure or site other than zoning. This is obvious given § 577.210(b)(iii)(10) which follows and specifically addresses the effect of local zoning ordinances on the project site. Under these circumstances, we see no existing municipal plan regarding the developments in question that has been impacted by RSS's proposed project and conclude that there is little likelihood of success on this point.

#### 4. *City Zoning Laws*

■ The City also claims that the project is objectionable as a violation of the City's zoning ordinances. Federal regulations permit such objections pursuant to 24 C.F.R. § 577.210(b)(iii)(10). However, the Peekskill zoning code defines a "family" to include three persons or less living together and not related by blood, marriage, or adoption. Peekskill Zoning Ordinance § 300–57(1)(c). Since the three units to be purchased by RSS will each house no more than three individuals, the plan does not seem to offend the City's residential zoning.

In the Florence Affidavit and at oral argument, plaintiff first raised the argument that the RSS units fell under the definition of "agency community residences" of § 300–57 of the Peekskill Zoning Code. To be precise, the Peekskill Zoning Code § 300–57 distinguishes between what it terms "agency group homes" and "agency community residences." Plaintiff argues that RSS's proposed transitional housing is contrary to the City's zoning ordinances. In particular, plaintiff maintains that under § 300–21(B)(7) of the Zon-

ing Code RSS will need a special permit to operate its units in Peekskill.

From the plain meaning of the City zoning laws, we conclude that plaintiff is incorrect. Sections 300–21(B)(7) and 300–24(B)(1)(j) only require special permits for "agency group homes" which are specifically defined in § 300–57 to include homes with more than three minors in residence. Nothing in the zoning ordinances says that special permits are required for "agency community residences" as defined by § 300–57. There is no evidence in the record that more than three minors will occupy any of RSS's transitional housing units.

Our conclusion is bolstered by the relevant state law. New York's Mental Hygiene Law § 41.34(f) explicitly states that community care residences, which by definition house between four and fourteen residents, shall be deemed a "family unit" for purposes of local laws and ordinances. The clear purpose of this provision was "to put an end to disruptive litigation over the location of such community residences within 'family' housing zones, *e.g.*, to prevent communities from using local zoning ordinances to keep community residences out of their neighborhoods." *See C.E.L. Lumber, Inc. v. Roberts*, 109 A.D.2d 1002, 486 N.Y.S.2d 481, 483 (3rd Dep't 1985) (citations omitted); *see also Crane Neck Assn. v. New York City/Long Is. County Servs. Group*, 61 N.Y.2d 154, 472 N.Y.S.2d 901, 906–07, 460 N.E.2d 1336, 1341 (1985). This provision mandates that community residences be treated as family units for purposes of local zoning ordinances and prevents the use of special permits and restrictive zoning ordinances. *Community Resource Center v. City of Yonkers*, 140 Misc.2d 1018, 532 N.Y.S.2d 332, 335 (Sup. 1988).

By relying upon its own zoning ordinances to require special permits for RSS's transitional housing, Peekskill's zoning ordinances appear to contravene this state law. Even if plaintiff is correct and the twenty-four hour supervisory staff constitute a fourth resident in each of the RSS units, state law would seem to require that RSS's transitional housing still be consid-

ered as residential family units. Taken together, we are left unconvinced that RSS's plan offends any element of Peekskill's zoning laws. It appears that this argument also stands little chance of success.

### 5. *Conformance with the CHAP*

■ As a private, non-profit organization planning to create transitional housing within an ESG formula city or county, that formula city or county must have an approved Comprehensive Homeless Assistance Plan in order for RSS to be eligible for federal funding. 24 C.F.R. § 577.-150(b)(4)(i). Moreover, under 24 C.F.R. § 577.210(b)(7), RSS must receive certification from that formula city or county that the project conforms to its CHAP before it can qualify for HUD funds.

However, since Peekskill has not demonstrated that it qualifies as an ESG formula city, *i.e.* a "metropolitan city," pursuant to 24 C.F.R. §§ 576.43 and 577.5, defendant RSS need not have received certification from it as plaintiff claims. Indeed, the statutory provision regarding "metropolitan city" suggests that since Peekskill has a population less than 50,000 and it is not one of the "central cities" in the New York metropolitan statistical area, it cannot qualify as a metropolitan city. *See* 42 U.S.C. § 5302(a)(4). And at oral argument, plaintiff conceded that it does not qualify as an ESG formula city. Rather, RSS must have such certification from the ESG formula county, apparently Westchester County here, and RSS has received this required certification.

■ Additionally, under New York's Mental Hygiene Law, state aid to voluntary agencies for the operation of community residential facilities for the mentally disabled requires prior approval by the "local governmental unit." *See* N.Y. Mental Hygiene Law § 41.33. However, "local governmental unit" is defined as a county with the exception of the city of New York and any county located within the city of New York. *See* N.Y. Mental Hygiene Law § 41.03(1). Quite obviously, Peekskill does not qualify as a local governmental unit under New York law. Nor does RSS's

proposed project qualify as a "community residential facility" as defined by § 41.-34(a)(1) since it will house only three residents. For these reasons, prior approval by Peekskill of RSS's project is not required by § 41.33 before New York could disburse its funds.

### 6. *Environmental Reviews*

Plaintiff also claims that RSS has not met the environmental review requirements of the federal regulations on HUD funding. Section 577.220(a)(2) places the responsibility for completing the environmental review on HUD's shoulders when an application is received from a private, non-profit organization like RSS. HUD completed its environmental review on September 17, 1992. HUD found the three proposed housing units in complete compliance except for a recommendation that consultations be held concerning historic preservation for the Greenacres unit which was located within 400 feet of a 50–year old building.

■ Regarding plaintiff's state environmental claims, RSS argues that no further environmental review is necessary pursuant to OMH regulations since funding housing for mentally disabled is classified as a "Type II" action. *See* 14 N.Y.C.R.R. 52.14(b) (Type II)(h). In response, plaintiff contends that under New York regulations defendants' activity is an "unlisted" action pursuant to N.Y.C.R.R. § 617.11 which may significantly affect the environment. We do not address the merits of this uniquely state law issue. As we touched on earlier, to the extent that plaintiff is challenging the actions of the Commissioner of OMH, plaintiff should seek redress in an Article 78 proceeding as directed by N.Y. Mental Hygiene Law § 41.34(d).

### 7. *Equities & Discrimination*

■ Lastly, plaintiff argues the equities of its case. In brief, plaintiff argues that it is being unfairly saddled with the county's public housing projects. The term plaintiff uses to describe itself is "dumping ground." In its submissions to HUD opposing the RSS application for funding,

Peekskill described itself as "saturated with group homes, group care facilities and transitional housing." *See* Schonfeld Affidavit, Exhibit C. In support of the present motion, plaintiff described the "undue concentration of disabled/assisted persons within the City of Peekskill." Florence Affidavit at ¶ 9. In support of its contention, plaintiff has offered voluminous evidence of the level of publicly assisted housing provided by the various towns and cities located within Westchester County.

Courts have recognized the important State policy of deinstitutionalizing mentally disabled individuals and using "community residences" to house and teach them the skills they need to rejoin society. *See, e.g., Crane,* 472 N.Y.S.2d at 906, 460 N.E.2d at 1340. Not surprisingly, however, that cities and towns that have shown a past willingness to accommodate less fortunate members of our community sometimes find that their contributions create a magnet effect, drawing in ever-increasing numbers of groups with special needs.

Peekskill should be commended for its past efforts. Every community has at least a moral duty to share in the care of those whose disabilities place them in situations of great need. "The fact that some neighborhoods have a relatively high concentration of community residents is unfair to those neighborhoods who have been chosen to carry the weight of the community's responsibility for the mentally disabled." *Crane,* 472 N.Y.S.2d at 907, 460 N.E.2d at 1341.

The responsibility for insuring that public housing is borne fairly by each community rests with the county, state, and federal governments. Their actions should not exacerbate existing inequalities in public housing, in effect ghetto-izing the mentally disabled. However, plaintiff's past efforts to provide transitional housing do not cre-

ate grounds for refusing to provide any more such housing. If the City of Peekskill feels it is wrongfully being treated by the state or county as a dumping ground for public housing, its political beef is with the state and the county.

■ Preventing housing for disabled people on the grounds that the City has already provided its fair share also comes perilously close to violating the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(1), which prohibits actions that "discriminate in the sale or rental, or [that] otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap."[1] It is also possible that Peekskill's position runs contrary to the recently enacted Americans With Disabilities Act as discrimination against people on the basis of their disability.

The basic tenor of plaintiff's objections is that the City already provides more than its fair share of housing for groups like the homeless and mentally disabled who depend upon public assistance. In short, Peekskill's message is: no more in my back yard. For the reasons discussed above, we give such arguments little consideration.

Moreover, evidence exists demonstrating that the dire predictions of irreparable harm voiced by plaintiff once nine mentally disabled people move into the RSS project are ill-founded. The director of the Westchester County Community Residents Information Service Programs ("CRISP"), responding to plaintiff's reliance on a CRISP report, stated that:

"In my seven years with CRISP I can recall no instance of unpleasantness surrounding any of the supported and/or supportive apartments used for rehabilitative purposes.... In this instance I cannot agree with the city, especially in their misuse of the CRISP report and statistics. I do object to having CRISP's

---

**1.** In plaintiff's Reply Affirmation, it raises the argument that the Fair Housing Act's application to plaintiff would be precluded by the Eleventh Amendment. Despite plaintiff's protestations, the Eleventh Amendment does not appear to preclude application of the FHA against plaintiff. Even were its immunity applicable to a municipality such as Peekskill, defendants would likely not seek monetary damages against Peekskill but rather prospective injunctive relief, probably ordering Peekskill to permit the homeless individuals to begin occupying RSS's transitional housing. The Eleventh Amendment does not shield a state from prospective injunctive relief. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

work "stretched" to fit an argument that it was not designed to address.

This tends to place plaintiff's claims of unfair burden and more speculative claims of irreparable harm in a somewhat different and less favorable light.

To conclude, because we find at present no likelihood of success on the merits, plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.