90 N.Y.2d 227 (1997)
682 N.E.2d 953
660 N.Y.S.2d 352
In the Matter of Gerald D. Jennings, as Mayor of the City of Albany, Respondent,
v.
New York State Office of Mental Health et al., Appellants.
Court of Appeals of the State of New York.
Argued April 30, 1997
Decided June 12, 1997.
Dennis C. Vacco, Attorney-General, Albany (Patrick Barnett-Mulligan, Barbara G. Billet and Peter H. Schiff of counsel), for New York State Office of Mental Health and another, appellants.
Stein & Schonfeld, Garden City (Robert L. Schonfeld, Seth P. Stein and Beth Pepper of counsel), for Rehabilitation Support Services, Inc., appellant.
Vincent J. McArdle, Jr., Corporation Counsel of City of Albany (Thomas A. Shepardson of counsel), for respondent.
Lydia R. Marola, Albany, for New York State Conference of Mayors and Municipal Officials, amicus curiae.
Simeon Goldman, Albany, for Disability Advocates, Inc., amicus curiae.
Chadbourne & Parke, L. L. P., New York City (Thomas E. Riley and Steven L. Vollins of counsel), for Planned Community Living, Inc., amicus curiae.
Douglas A. Eldridge, Albany, for New York State Rehabilitation Association, Inc., amicus curiae.
Chief Judge KAYE and Judges TITONE, BELLACOSA, LEVINE, CIPARICK and WESLEY concur.
*233 SMITH, J.
New York State policy has long favored the establishment of *234 residential housing facilities to deinstitutionalize the treatment of mentally disabled persons. However, some residents of the Pine Hills community in the City of Albany (the City) believed that their neighborhood was already overcrowded with such facilities. The present dispute arose when the City filed an objection to the siting of the newest housing residence proposed for the area pursuant to Mental Hygiene Law § 41.34. Following a hearing, the Acting Commissioner of the New York State Office of Mental Health (the Commissioner) found that the proposed facility would not substantially alter the nature or character of the neighborhood in question.[1] We conclude that the determination of the Commissioner is supported by substantial evidence and dismiss the City's CPLR article 78 petition against the Commissioner's decision.
In December of 1994, Rehabilitation Support Services, Inc. (RSS), a private sponsor of residential facilities for disabled adults, notified the City that it wished to renovate an abandoned structure at 117 South Lake Avenue and open a community residential facility for the mentally disabled at that location. Gerald D. Jennings, the Mayor of the City of Albany, wrote the Commissioner "to formally object to the siting of a community residence proposed for the premises located at 117 South Lake Avenue." Without suggesting an alternative site for the proposed facility, Mayor Jennings requested a hearing pursuant to Mental Health Law § 41.34 (c) (5) to resolve the dispute. It was the first time that the City had objected "under the Mental Hygiene Law to [the] siting of a facility."
At the hearing, the Director of Program Development for RSS testified that the proposed facility would provide transitional *235 housing for 10 mentally disabled adults who had been recently discharged from an institutional psychiatric hospital. The RSS representative testified that the facility would offer a "supportive natural setting" for the residents to organize their lives, set goals and prepare "for [a] more long-term housing setting where they would then continue their progress in their rehabilitation and using a variety of community services to help them do that." She testified that residents would attend school or work during the day. In the evenings, residents would dine together "family style" and engage in various activities, such as homework or household chores, before retiring.
Licensed by the New York State Office of Mental Health, the facility would be supervised around the clock by a nonresident staff working in shifts. At most times, one or two staff members would be on duty but up to three staff members could share supervisory responsibilities during the busiest part of the day. Persons who are in immediate danger to themselves or others, are chemically dependent upon drugs or alcohol or have acute medical needs that require on-site medical supervision would not be permitted to reside in the house.
A representative of the Albany County Department of Mental Health testified that according to the estimates of the Albany County Discharge Facilitation Program, there were around 90 people receiving inpatient care who were presently in need of a community residential placement such as the one proposed. There was also evidence that, at the time, there was "only one other similar residential program" providing a short-term placement option for the mentally disabled in the process of "reentering and integrating themselves into the community." The need for the proposed facility was apparently exacerbated by the mandated "depletion of inpatient services" at area State psychiatric hospitals. In a written statement, the Albany County Department of Mental Health professed its support of the proposed facility "in the hopes of offsetting potential increases in homelessness, recidivism, and overall disenfranchisement that could result within our community." The City did not dispute the need for the proposed facility.
The City's Director of Planning testified that the decrepit building where the new facility was to be established was currently a "blighting influence" on the community. The witness acknowledged that the planned renovation "might be a physical improvement in terms of the exterior of the building." Nevertheless, the Planning Director and the City's remaining witnesses still argued against the establishment of the proposed *236 residence because the area was already over concentrated with such housing facilities.
According to the City's witnesses, the prevalence of special needs housing already in the neighborhood had a negative effect on property values which made it difficult for people to sell and to attract others to the area. One witness claimed to have heard of a real estate agent who would not show houses in the area because the neighborhood had become known as "where all the nuts live." Others testified that some parents in the neighborhood would not let their children play on the front yard of their homes. Another witness testified to "erratic, annoying, [and] disturbing behavior" by residents of facilities already established in the neighborhood.
The Hearing Officer's report is dated June 20, 1995. She defined the relevant area to examine. Some witnesses had testified about the boundaries encompassed by the Pine Hills Neighborhood Association. The City's Director of Planning had submitted maps showing special needs housing facilities within varying concentric circles around 117 South Lake Avenue, the site of the proposed facility. However, the Hearing Officer delineated the relevant area as that within the boundaries suggested by the residents living closest to 117 South Lake. These residents, who testified on behalf of the City, testified about their understanding of the boundaries of their immediate neighborhood. The Hearing Officer stated that her "visit to the site and its environs verified this testimony."
Within this 13-block area, the Hearing Officer found four similar facilities already in existence. Some facilities were not considered because they were located outside the immediate neighborhood. One residence within the relevant area was not considered because its housing capacity was over 14, the maximum defined under Mental Hygiene Law § 41.34.
Finally, the Hearing Officer did not factor in the presence of Oxford House, "an unlicensed self-selecting group of adults recovering from addictions living together in a residence" located within the neighborhood. The fact that Oxford House was not licensed by the State was significant in her decision to exclude it in her analysis of over concentration. As she stated "[t]he development of better neighborhood housing for the developmentally and mentally disabled should not be stymied by the presence of housing developed by unrelated adults banding together for `moral support and counseling.'"
The Hearing Officer concluded that the "siting of the proposed facility at 117 South Lake Avenue will not result in *237 such a concentration of community residential facilities of this type in this municipality that the nature and character of the area would be substantially altered." The Hearing Officer further opined that the "real issue driving this hearing" could be "laid squarely at the doorstep of the Alcohol Crisis Center, a 40 bed shelter for alcoholics located within CDPC [Capital District Psychiatric Center] * * *. A drunk tank can not be added to a residential mix without negatively affecting all the other facilities in the area, and dampening the welcome historically given by the neighbors."
The Commissioner concurred with the Hearing Officer's recommendation and concluded that the establishment of the residence would not result in a substantial change in the nature and character of the neighborhood. The Commissioner rejected the testimony about "inappropriate behavior" as vague and unassignable "to persons who reside in programs such as that proposed." The Commissioner noted that testimony about diminished property values was irrelevant to the issue of substantial alteration to the area. He also noted that "perceptions about persons with mental disabilities cannot be used to bar housing for [those] persons * * * just as perceptions about persons based on their race, religion and ethnicity cannot be used to keep such persons from residing in a neighborhood."
The Commissioner adopted the delineation of the relevant area recommended by the Hearing Officer. In his examination of the facilities already within the neighborhood, the Commissioner found "ten residential programs which must be considered on the issues of over concentration and substantial alteration." These included the four considered by the Hearing Officer and the one facility excluded by the Hearing Officer as too large. Also included for consideration were five one- or two-bedroom residence apartments licensed by either the Office of Mental Health (OMH) or the Office of Mental Retardation and Developmental Disabilities (OMRDD).
Eight facilities were excluded as "located outside of the determined neighborhood." Two facilities were rejected due to their location and their size and functional dissimilarities with the proposed facility. The latter ground alone was sufficient to exclude two other facilities from consideration, the CDPC (a 210-bed inpatient hospital) and the Alcoholism Receiving Center (a 40-bed detoxification facility). Finally, the Commissioner did not consider Oxford House because it was not licensed by OMH or OMRDD.
*238 The Commissioner noted that the "Site Selection Law is not concerned with over concentration alone" and further stated that "evidence of nearby facilities cannot sustain the municipality's objection without sufficient proof of substantial alteration which would result from the latter." The Commissioner found that such evidence was lacking in this case. In so holding, the Commissioner acknowledged the apprehensions of the City's witnesses as "subjectively genuine" but concluded that the residents' primary concern had to do with the behavior of persons who utilized the Alcoholism Receiving Center, just as the Hearing Officer had also noted. However, the Commissioner found that "the testimony that these behaviors may be continued and expanded on by individuals residing in the proposed program is wholly speculative and not convincing in any manner. Such conjectural testimony cannot support a conclusion that the proposed residence would substantially alter the area."
The City filed this article 78 proceeding seeking to annul the Commissioner's decision. The City's primary argument concerned the "area" examined. According to the City, the Commissioner arbitrarily excluded several facilities from consideration by limiting his analysis to the "neighborhood" rather than the "area."
The Appellate Division compared the 13-block area examined by the Commissioner with the maps prepared by the City that depicted the number of special needs housing within a three-fourths-mile radius of 117 South Lake Avenue. The Court found that the Commissioner's delineation of the affected area was arbitrary and capricious and annulled the Commissioner's approval of the residence:
"Although we recognize there can be no precise definition of an `area,' and the Commissioner's findings in this regard are entitled to great deference, in this unique situation where there is a high concentration of similar facilities that impact upon the subject area, we find that the Commissioner's delineation of the neighborhood boundaries to exclude a number of other residential facilities in close proximity to the site in question was arbitrary and capricious, and that an additional community residence would only serve to continue the substantial alteration of the nature and character of the area" (220 AD2d 148, 151-152).
*239 This Court granted leave to appeal.
An initial question arises concerning the proper standard of review of the Commissioner's decision. As we stated in Matter of Silberfarb v Board of Coop. Educ. Servs. (60 N.Y.2d 979), "Judicial review of administrative determinations made as the result of a hearing required by law is limited to a consideration of whether that resolution is supported by substantial evidence" (id., at 981). "Substantial evidence `means such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact'" (Matter of Consolidated Edison Co. v New York State Div. of Human Rights, 77 N.Y.2d 411, 417, quoting 300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 N.Y.2d 176, 180).
An administrative agency's determination need not be the only rational conclusion to be drawn from the record. However, the existence of other, alternative rational conclusions does not warrant annulment of the agency's conclusion (see, Matter of Consolidated Edison Co. v State Div. of Human Rights, supra, at 417 ["Although a contrary decision may be reasonable and also sustainable, a reviewing court may not substitute its judgment for that of the Commissioner if his is supported by substantial evidence"]; Matter of Stork Rest. v Boland, 282 N.Y. 256, 267 [courts may not "reject the choice made by the [agency] where the evidence is conflicting and room for choice exists"]). Simply put, a reviewing court may not substitute its own judgment for that of the agency.
Here, the Appellate Division applied an arbitrary and capricious standard of review of the Commissioner's interpretation of the term "area" in Mental Hygiene Law § 41.34 (see, Matter of Pell v Board of Educ., 34 N.Y.2d 222). While factual findings made pursuant to a hearing required by law must be affirmed when supported by substantial evidence in the record, we have applied an arbitrary and capricious standard of review for challenges to an agency's interpretation or application of a statute or regulation (see, Matter of New York Times Co. v City of New York Commn. on Human Rights, 41 N.Y.2d 345). However, when construction of a statute depends on an "understanding of underlying operational practices" or "entails an evaluation of factual data and inferences to be drawn therefrom," the question of statutory interpretation is generally left to the special expertise of the agency and the determination is entitled to deference when it is not irrational or unreasonable (Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459).
*240 Importantly, we have noted that rationality is the underlying basis for both the arbitrary and capricious standard and the substantial evidence rule. It is this concept which guides our analysis of the Commissioner's decision for both its rationality and record support (see, Matter of Borenstein v New York City Employees' Retirement Sys., 88 N.Y.2d 756, 760-761). Both tests are satisfied here.
Mental Hygiene Law § 41.34 was enacted and designed "to facilitate the establishment of community residences" (Governor's Approval Mem, L 1978, chs 468, 469, 470, 1978 McKinney's Session Laws of NY, at 1821; see also, Crane Neck Assn. v New York City/Long Is. County Servs. Group, 61 N.Y.2d 154). As Governor Carey wrote in approving the bill, the law was a legislative attempt "to encourage a process of joint discussion and accommodation between the providers of care and services to the mentally disabled and representatives of the community" (1978 McKinney's Session Laws of NY, at 1821). In creating a balance between these potentially competing interests, the Legislature set forth a specific mechanism for the resolution of disputes involving the placement of community residences for the mentally disabled. A sponsoring agency intending to establish or operate a community residential facility for the disabled must provide notice of such intention to the chief executive officer of the municipality (Mental Hygiene Law § 41.34 [c] [1]). The municipality, in turn, may either approve of the recommended site, suggest alternatives within the jurisdiction, or outright object to the proposal. The Commissioner of the department responsible for licensing the proposed facility must hold a hearing to resolve any dispute (Mental Hygiene Law § 41.34 [c] [5]).
In reviewing any objection to the facility, the Commissioner must consider the need for the facility and the concentration of similar facilities already established in the area (id.). Nevertheless, the only ground provided in the statute to justify sustaining the objection is if the Commissioner determines "that the nature and character of the area in which the facility is to be based would be substantially altered as a result of establishment of the facility" (Mental Hygiene Law § 41.34 [c] [5]). Thus, while over concentration is certainly relevant, whether the nature and character of an area will be substantially *241 altered by the establishment of the proposed facility is the dispositive inquiry.[2]
Here, the Commissioner's delineation of the area to be affected by the establishment of the proposed residence is rational and supported by the evidence adduced at the hearing. The Commissioner determined that the relevant "area" was the neighborhood beginning "at Morris Street * * * east to Robin Street, south to Myrtle Avenue, west to South Lake, south to its intersection with New Scotland and Woodlawn Avenues, west on Woodlawn Avenue to Ontario Street and north again to Morris Street." The larger area urged by the City is delineated by a circle within a three-fourths-mile radius from 117 South Lake. This boundary has no relation to physical or subjective neighborhood limits. In contrast, the Commissioner relied upon boundaries created by parks and main thoroughfares which residents were not likely to cross on foot.
The Commissioner's determination rationally adopts the boundaries of the neighborhood as defined by the City's own witnesses. It was the neighbors closest to 117 South Lake Avenue who testified about the boundaries of their neighborhood and it is in that neighborhood where the proposed facility would be located. Such evidence is of paramount importance under the State policy, which is geared towards incorporating the mentally disabled into "the life of the community which is expected to provide them with sustenance" (Governor's Approval Mem, 1978 McKinney's Session Laws of NY, at 1821). Accordingly, the Commissioner may properly focus on the potential impact upon direct "neighbors" (id.).
The Appellate Division's choice of a different area was simply that  a different choice. The record contains evidence relating to zoning districts, zip code districts and census districts as well as boundaries within concentric circles radiating out from the site of the proposed facility in varying one-fourth-mile increments. Although the relevant area might reasonably have been determined in a variety of ways, the dispositive inquiry is *242 whether the establishment of the subject facility will substantially alter the nature or character of the area in which the facility will be located and there is little evidence of this beyond speculation.[3] If the proposed facility would not "substantially alter" its immediate neighborhood, it is difficult to find fault with the conclusion that adjacent areas would be little affected. In sum, the Commissioner's decision to examine the potential impact of the proposed facility upon its immediately surrounding community is entitled to deference as rational and supported by the record.
The City argues primarily that, upon consideration of a larger area, more facilities would be encompassed within the analysis. That a larger area includes more facilities is not surprising. However, the inverse corollary is also true. More facilities would be found over a larger area. Here, there is no indication that the larger area considered by the Appellate Division would be any more "saturated" than the smaller neighborhood examined by the Commissioner. In fact, the maps prepared by the City support the opposite conclusion.
It should be noted that one of the goals of the statute is to avoid over concentration of such facilities in any one area. Nevertheless, as the Commissioner noted, the mere number of "special needs" facilities within an area is not dispositive.
Here, the evidence strongly supports the conceded need for the proposed residence and the City suggested no alternative site. The mere presence of other facilities already situated in a particular area cannot be the sole basis for denying the establishment of a similar new facility when such need for that facility is demonstrated. This is precisely the balance reached by the statute in which concentration is relevant but secondary to a determination that the nature and character of an area will be "substantially altered." Thus, it was reasonable for the Commissioner to require proof of more than a mere recitation of the number of other facilities located in the same area to sustain the City's objection.
*243 Finally, the Commissioner's decision to limit his examination to certain facilities was not arbitrary. The Mental Hygiene Law only requires the Commissioner to consider
"the existing concentration of such facilities and other similar facilities licensed by other state agencies in the municipality or in the area in proximity to the site selected and any other facilities in the municipality or in the area in proximity to the site selected providing residential services to a significant number of persons who have formerly received in-patient mental health services in facilities of the office of mental health or the office of mental retardation and developmental disabilities" (Mental Hygiene Law § 41.34 [c] [5] [emphasis supplied]).
Thus, under section 41.34, only facilities which are licensed by a State agency or which house former patients of OMH/OMRDD services must be considered. In contrast, the City argues that all "special needs" facilities should be taken into account regardless of licensing status, size or function. Such a sweeping position is not the one adopted by the Legislature and the Commissioner's conclusions in this regard are rational.
Judging from the testimony of the residents, it appears that many of the concerns may be traced to the Alcoholism Receiving Center and the nonlicensed Oxford House. The proposed residence at issue, however, is for individuals who suffer from mental disabilities, not addiction. Concerns about behavior of those receiving treatment for addiction must not obfuscate the primary issue before us. The record supports the Commissioner's conclusion that the addition of a residence housing 10 mentally disabled adults would neither result in an over concentration of similar facilities nor substantially alter the nature and character of the neighborhood.
Accordingly, the judgment of the Appellate Division should be reversed, with costs, and the petition dismissed.
Judgment reversed, etc.
NOTES
[1] Mental Hygiene Law § 41.34 (c) (5) provides: "In the event the municipality objects to establishment of a facility in the municipality because to do so would result in such a concentration of community residential facilities for the mentally disabled or combination of such facilities and other facilities licensed by other state agencies that the nature and character of areas within the municipality would be substantially altered; or the sponsoring agency objects to the establishment of a facility in the area or areas suggested by the municipality; or in the event that the municipality and sponsoring agency cannot agree upon a site, either the sponsoring agency or the municipality may request an immediate hearing before the commissioner to resolve the issue. The commissioner shall personally or by a hearing officer conduct such a hearing within fifteen days of such a request. * * * The commissioner shall sustain the objection if he determines that the nature and character of the area in which the facility is to be based would be substantially altered as a result of establishment of the facility. The commissioner shall make a determination within thirty days of the hearing."
[2] The Appellate Division did not address the contention of RSS that Mental Hygiene Law § 41.34 is preempted by Federal law (see, e.g., Larkin v State of Mich. Dept. of Social Servs., 89 F.3d 285 [6th Cir 1996] [State law designed to prevent "clustering" of group homes for disabled persons was preempted by Fair Housing Act, 42 USC § 3604]). We decline to reach the issue because our review of the Commissioner's determination allows the proposed facility to proceed as planned. However, we note that a "density regulation that others need not observe" was invalidated on constitutional grounds as applied to a home for the mentally retarded in Cleburne v Cleburne Living Ctr. (473 US 432, 450).
[3] The City argues that the proposed facility would substantially increase "foot traffic" in the neighborhood. The creation of the "parking lot/area" with the "designated handicap accessible parking spot" was also characterized as "detrimental" by the City because cars "will now be parked outside in the open as opposed to housed in a garage." Finally, the City speculated that the facility would need "numerous trash barrels" which would "obviously constitute a visible eyesore to the citizens." The record supports the Commissioner's rejection of these arguments.