Gilda **DE JESUS–KEOLAMPHU**, Narong Keolamphu, Gerda Bartnik and Kazimierz Bartnik, Plaintiffs,

v.

The **VILLAGE OF PELHAM MANOR,** New York, Mayor Valentine Taubner of the Village of Pelham Manor, New York, Deputy Mayor and Trustee Brian Gallagher and Trustees Ferdinand Spucci, John Kiernan, and Peter Dipaola as the Board of Trustees of the Village of Pelham Manor, New York, each of the above is sued in their official capacity and as individuals, Commissioner of the State of New York Office of Mental Retardation and Disabilities, Thomas A. Maul, Assistant Commissioner of the State of New York Office of Mental Retardation and Disabilities, Susan B. O'Reilly, and Program Development Specialist for the New York State Westchester Developmental Disabilities Services Office, Jeffrey Envid, each of the above is being sued in their official capacity and as individuals, State of New York Office of Mental Retardation and Disabilities Services, St. Agatha Home of the New York Foundling Hospital and Elizabeth Ekizian, Defendants.

No. 96 Civ. 1154(WCC).

United States District Court, S.D. New York.

April 3, 1998.

558

Law Offices of John R. Kelligrew, White Plains, NY, for plaintiffs, John R. Kelligrew, of counsel.

Thomas M. Bona, P.C., for defendants The Village of Pelham Manor, Valentine Taubner, Brian Gallagher, Ferdinand Spucci, John Kiernan and Peter DiPaola, White Plains, NY, Thomas M. Bona, of counsel.

Dennis C. Vacco, Attorney General of the State of New York, New York City, for State defendants, Jay T. Weinstein, Asst. Atty. General, of counsel.

Mendes & Mount, L.L.P., for defendants St. Agatha Home of the New York Foundling Hospital and Elizabeth Ekizian, New York City, Colleen M. Magarian, of counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This case arises out of plaintiffs' opposition to the relocation onto their street of a residential home for mentally retarded adults. At bottom, plaintiffs claim that the decision to place the group home on their street was racially motivated. Named as defendants are numerous entities and individuals allegedly responsible for the relocation. They are: (1) the Village of Pelham Manor, where plaintiffs reside and where the group home is located; (2) Valentine Taubner, the former mayor of the village, and Brian Gallagher, the current mayor and a former trustee of the village; (3) Ferdinand Spucci, John Kiernan, and Peter DiPaola, former village trustees; (4) the State of New York Office of Mental Retardation and Developmental Disabilities (the "OMRDD"); (5) Thomas Maul and Susan O'Reilly, the commissioner and assistant commissioner, respectively, of the OMRDD; (6) Jeffrey Envid, an employee of the Westchester Developmental Disabilities Services Office, which is a local branch of the OMRDD; (7) St. Agatha Home of the New York Foundling Hospital, a not-for-profit corporation that runs the group home at issue; and (8) Elizabeth Ekizian, the Director of ICF Programs for St. Agatha.

Presently before the court are motions by each of three groups of defendants. First, the "Village Defendants" (the Village of Pel-

ham Manor, Taubner, Gallagher, Spucci, Kiernan, and DiPaola) move for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Second, the "State Defendants" (the OMRDD, Maul, O'Reilly, and Envid) move to dismiss the amended complaint, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted. Third, the "St. Agatha Defendants" (St. Agatha and Ekizian) also move to dismiss pursuant to Rule 12(b)(6). The Village and St. Agatha Defendants also seek attorneys' fees pursuant to Rule 11 and 42 U.S.C. § 1988(b).

For the reasons discussed below, the motions are granted.

## BACKGROUND

### I. Mental Hygiene Law

█ Before setting out the relevant facts, a brief explanation of New York's Mental Hygiene Law (the "MHL") will provide a framework for assimilating the facts. The MHL reflects New York's "policy favoring the deinstitutionalization of mentally and developmentally disabled persons, and their placement in supervised residences housing small groups." *Crane Neck Ass'n, Inc. v. New York City/Long Island County Servs. Group,* 61 N.Y.2d 154, 472 N.Y.S.2d 901, 904–05, 460 N.E.2d 1336, 1339 (1984). It provides for grants and reimbursements to entities operating such community residences. *See id.*

Section 41.34 of the Mental Hygiene Law—also known as the "Padavan Law"—establishes site selection procedures for community residences. Section 41.34(c)(1) provides that a sponsoring agency shall notify the municipality when it has selected a site for a community residence. The municipality then has 40 days to approve the recommended site, suggest suitable alternative sites, or object to the site on the grounds of over-concentration or substantial alteration of the neighborhood. Section 41.34(c)(5) provides that if the municipality and the sponsoring agency cannot agree on a location, either party can request an immediate hear-

ing (a "Padavan hearing") before the appropriate state agency.

These selection procedures were designed to "minimiz[e] resistance and avoid[ ] legal battles that had impeded the community residence program." *Crane Neck*, 472 N.Y.S.2d at 906–08, 460 N.E.2d at 1341–43. As the following factual account demonstrates, this goal has not always been met.

## II. *Facts*

The following factual account is culled from the Amended Complaint and the 600 pages of exhibits annexed thereto.

Plaintiffs Gilda De Jesus Keolamphu, Narong Keolamphu, Gerda Bartnik, and Kazimierz Bartnik are two couples living on Shore View Circle, a cul-de-sac in Pelham Manor. Mrs. De Jesus Keolamphu is Hispanic and Dr. Keolamphu is Thai. The Bartniks are caucasians of European descent. The other residents of Shore View Circle include Byonsuk and Shihan Kim, a Korean–American couple; inhabitants of a consular residence of the Federal Republic of Nigeria; and Fred and Lorette Werner and Nicholas Clemente, also caucasians of European descent.[1]

In 1979, St. Agatha established a group home for eight mentally retarded adults in a rented house at 895 James Street in Pelham Manor. In 1988, the Village was notified by New Directions in Human Services, Inc. ("New Directions"), pursuant to the Padavan Law, of its intent to establish a second group home at 494 Siwanoy Place. Citizens residing nearby the proposed site opposed the location. Accordingly, the Village appointed a site selection committee (the "Committee") to identify and suggest alternate locations. In its November 14, 1988 report, the Committee identified eight alternate sites for the new group home. Of the eight, the Committee's unanimous first choice was One Shore View Circle because it was a structurally adaptable house on a large, flat lot with no through traffic, in close proximity to public transportation, public parks, and a church. (*See* Site Selection Committee Report, attached as Exh. 21 to Am.Compl.) Eventually, the list was paired to four possible locations, with One Shore View Circle remaining the top choice.

Later that month, the Village Board of Trustees held two public meetings to discuss the alternate sites. Plaintiff Gerda Bartnik attended these meetings and expressed her opposition to Shore View Circle as an alternate location. Mrs. Bartnik asserted that the house at that location was inadequate and that traffic on the cul-de-sac was "fast and heavy." (*See* Minutes of Nov. 17, 1988 Public Hearing, attached as Exh. 24 to Am.Compl.) She also contended that the Committee's judgment was clouded by conflicts of interest. (*See* Minutes of Nov. 21, 1988 Public Hearing, attached as Exh. 25 to Am.Compl.) At the latter meeting, then-Mayor Jack Kaufmann indicated that the Board of Trustees had heard that One Shore View Circle was no longer on the market. The Board indicated that it would keep the Shore View Circle site on the list until such information could be confirmed. (*See id.*) The point became moot, however, when New Directions withdrew its application to establish a group home. (*See* Exhs. 31–33 to Am.Compl.)

In any event, One Shore View Circle was back on the market by May 1992. (*See* Am.Compl. ¶ 127 & Exh. 36 attached thereto.) In January 1994, St. Agatha arranged to purchase One Shore View Circle, intending to move its group home to that location at the expiration of its James Street lease. After arranging the purchase, St. Agatha notified the Village of its plans. (*See* Am. Compl. ¶¶ 140–43 & Exh. 41 attached thereto.) On February 28, 1994, the Village held a public meeting to discuss the proposed relocation. Mrs. De Jesus Keolamphu, Mrs. Bartnik, and Dr. Shihan Kim attended the meeting, at which Mrs. Bartnik read a prepared statement. The statement stated that "we the homeowners of Shore View Circle believe that we have been discriminated against due to the fact that we are the minority" and threatened litigation "to seek relief for damages caused by discrimination."

---

1. Although the Werners reside at 6 Shore View Circle and Mr. Clemente resides at 8 Shore View Circle, plaintiffs assert that neither residence is part of the "Shore View Circle neighborhood" because the entrances to those homes are not on Shore View Circle.

(Exh. 44 to Am.Compl.) Dr. Kim also read a prepared statement, in which he expressed concern that double parking by the group home's staff would interfere with his on-call duties as a physician. He also stated: "We feel we are being discriminated against because we are a five family minority neighborhood.... I feel that our neighborhood has been targeted and that we have been unfairly discriminated against." (Exh. 45 to Am. Compl.)

A second public meeting was held on March 7, 1994. Again, Mrs. De Jesus Keolamphu, Mrs. Bartnik, and Dr. Kim were in attendance. At the meeting, then-Mayor Taubner and Trustee Spucci each read a letter from Elizabeth Ekizian, the director of St. Agatha's group home. In the letters, Ekizian explained the reasons for moving the home from James Street to Shore View Circle, including St. Agatha's inability to purchase the 895 James Street property and the practical benefits of the property at One Shore View Circle. (*See* Exh. 46 to Am. Compl.) At the conclusion of the meeting, the Village Board passed the following resolution:

> ... WHEREAS, St. Agatha determined that it wished to move its facility from 895 James Street because of, among other things, the high rent being sought by the landlord; and
>
> WHEREAS, St. Agatha examined eleven houses for sale in both [Pelham Manor] and the Village of Pelham; has carefully considered the alternative properties available for sale; and, has chosen the property at 1 Shore View Circle as the best alternative to its current site on James Street; and
>
> WHEREAS, St. Agatha has made arrangements to purchase 1 Shore View Circle; and ...
>
> WHEREAS, a relocation of St. Agatha to 1 Shore View Circle would remove [that] property from the tax rolls, costing the village, town, county and school district approximately $12,000 yearly; and
>
> WHEREAS, both properties would continue on the tax roll if St. Agatha were to remain at its James Street address; and

> WHEREAS, [at the request of the Village], the landlord at James Street has agreed to reduce the requested rent to a level that had been paid by St. Agatha in the past ...
>
> RESOLVED, that, because of the impact on the tax roll of a move to 1 Shore View Circle and because the rental terms at 895 James Street would remain at prior levels—and only for these reasons—the Board of Trustees recommends ... that St. Agatha remain at its James Street location as an alternative site for its facility; and it is further
>
> RESOLVED, that should the James Street location be found an unsatisfactory alternative, the Board finds that the 1 Shore View Circle Site is adequate.

(*Id.*)

The next day, St. Agatha rejected the Village's proposal that it remain at the James Street location as an alternative to relocating to Shore View Circle. Ekizian explained St. Agatha's position in a March 8 letter to Taubner:

> St. Agatha ... has reviewed carefully and must reject the alternate site proposed by the Village....
>
> ... As you know, at 9:15 on March 1, 1994, I telephoned Ms. Laura Alessandro [the landlord of 895 James Street] and asked her if she had re-considered her position [not to sell the house]. She stated, "No, I don't think so; but, even if I did, you couldn't afford it. I'd want $750,000." I replied, "Thank you, Ms. Alessandro."
>
> Historically, this landlord has been difficult to deal with. The last lease took eighteen months to negotiate....
>
> ... St. Agatha ... has made the commitment to purchase and operate a home for the program participants currently served at 895 James Street. We believe that we will provide a greater sense of permanence and security to both the individuals cared for and their families.
>
> Maintenance issues, which have been most problematic with the current landlord, will be resolved in a more timely fashion. St. Agatha Home can give more attention and care to its own property in

an expeditious manner without the difficulties and delays incurred [because of] uncooperative landlords.

Additionally, during the past five years. [*i.e.,* since St. Agatha signed its current James Street lease], the State of New York has extended the ability [of agencies operating community homes] to purchase properties through tax exempt bonds....

The house located at One Shore View Circle is the one house viewed [by St. Agatha] which uniquely is suited to the specific needs and abilities of our program participants and is within our price range. Specifically, the property is fairly flat to accommodate an aging group; there are sufficient bedrooms, bathrooms and overall living space; the house is in a residential neighborhood which is safe and accessible to amenities including shopping, transportation, medical and recreational facilities, and houses of worship; there [are] public water and sewer services; and there is a usable two-car garage and sufficient paved off-street parking for clinicians and direct care staff who work at the group home. Lastly, the house is across from [Shore Park] which is an ideal recreational and therapeutic setting for our population.

Our agency is committed to ensuring and enhancing the quality of life for each individual whom we serve. We strongly believe that we can best do this by establishing a permanent home over which we exert control, thereby reassuring both participants and [their] families of our long-term commitment to a high quality of life and care....

(Exh. 47 to Am.Compl.)

At a March 14, 1994 meeting, the Village Board met to consider its response to St. Agatha's rejection of the Board's alternate site. According to the minutes of the meeting, Mrs. Bartnik "urged the Board to recommend other alternative[ ] [sites] and threatened litigation if [it] did otherwise." (Exh. 51 to Am.Compl.) Instead, however, the Board resolved to challenge the rejection at a Padavan hearing before the OMRDD. (*See id.*) On March 18, 1994, in a letter to OMRDD Commissioner Maul, the Village formally requested a hearing and submitted its position on the issue. In essence, the Village opposed the relocation for tax reasons. (*See* Exh. 53 to Am.Compl.) St. Agatha submitted its position on March 31 in a letter that reiterated and expanded on the points made in Ekizian's March 8 letter. (*See* Exh. 62 to Am.Compl.)

On May 2, OMRDD Commissioner Maul ruled against the Village, finding that the One Shore View Circle location was superior to the alternate site. Thus, St. Agatha was permitted to relocate to Shore View Circle. (*See* Exh. 78 to Am.Compl.)

The Keolamphus and Bartniks challenged the Commissioner's decision in an Article 78 proceeding in the Supreme Court of the State of New York. On October 11, 1994, the Supreme Court vacated the Commissioner's decision. However, on January 8, 1996, the Appellate Division reversed on the ground that the petitioners lacked standing to challenge the Commissioner's decision. *See In re Bartnik v. Maul,* 636 N.Y.S.2d 815, 223 A.D.2d 541 (2d Dep't 1996). The Court of Appeals denied petitioners leave to appeal. *See In re Bartnik v. Maul,* 87 N.Y.2d 811, 644 N.Y.S.2d 144, 666 N.E.2d 1058 (1996).

While the state court appeal was pending, St. Agatha sought a building permit for alterations to One Shore View Circle. At plaintiffs' urging, and citing the Supreme Court's ruling, the Village declined to process the permit application. In response, St. Agatha commenced an Article 78 proceeding against the Village and filed a housing discrimination complaint with the United States Department of Housing and Urban Development ("HUD"). Ultimately, the state court dismissed St. Agatha's petition and the Village issued the building permit, rendering the HUD complaint moot.

In early 1996, plaintiffs filed a complaint against defendants in state court. The case was removed to federal court. Fourteen months later, plaintiffs filed an amended complaint asserting seven causes of action. The first three claims, asserted by the Keolamphus only, set out claims under 42 U.S.C. §§ 1981, 1983, and 1985 for intentional racial discrimination. The fourth claim, against the State Defendants and the St. Agatha Defen-

dants, alleges a violation of 42 U.S.C. § 2000d. The fifth claim alleges a violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* The sixth claim, brought pursuant to 42 U.S.C. § 1983, alleges that defendants deprived plaintiffs of their First Amendment free speech rights. Finally, the seventh claim alleges intentional racial discrimination in violation of Article 1, Section 11 of the New York State Constitution. For each cause of action, plaintiffs seek compensatory damages in the amount of $350 million, as well as punitive damages. In total, then, plaintiffs seek $2.45 *billion* in compensatory damages. Plaintiffs also seek a permanent injunction preventing defendants from establishing a group home for the mentally retarded at One Shore View Circle.

## DISCUSSION

### I. *Standards of Review*

#### A. *Rule 12(b)(6) Motions*

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must presume all factual allegations in the complaint to be true, and must view them in the light most favorable to the plaintiff. *See Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993). The Court may consider only (1) the facts stated on the face of the complaint, (2) documents appended to the complaint, (3) documents incorporated in the complaint by reference, and (4) matters of which judicial notice may be taken. *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991). However, "if the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint." *Sazerac Co. v. Falk,* 861 F.Supp. 253, 257 (S.D.N.Y.1994) *accord International Customs Assocs., Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1255 n. 2 (S.D.N.Y.1995).

"Dismissal of the complaint is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *see also Detko v. Blimpies Restaurant,* 924 F.Supp. 555, 557 (S.D.N.Y.1996).

#### B. *Rule 56(b) Motion*

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in·favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the nonmoving party. *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir.1988).

The· party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990).

## II. *Eleventh Amendment*

■ The State Defendants correctly argue that they cannot be sued in their official capacity for monetary damages in federal court. In opposition, plaintiffs contend that "[t]he State's reliance on *Papasan v. Allain*, [478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)] is misplaced. It forgot to read page 277 of that case which states: 'Thus, the official, although acting in his official capacity, may be sued in federal court.'" (Pls.' Mem. in Opp. to Mot. to Dismiss at 10.) It is plaintiffs' attorney who needs to read more carefully: a long line of cases, *Papasan* included, have held that the Eleventh Amendment bars federal court damages actions against states and state officials in their official capacities. *See, e.g., Papasan*, 478 U.S. at 276–78; *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir.1998); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir.1988).[2]

■ This bar, however, does not apply to plaintiffs' Title VI claim. *See Lane v. Pena*, 518 U.S. 187, 196–98, 116 S.Ct. 2092, 2099, 135 L.Ed.2d 486 (1996) (Congress expressly abrogated states' Eleventh Amendment immunity for Title VI claims); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 72–73, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (same). To the extent, then, that plaintiffs seek retrospective, monetary relief against the State Defendants in their official capacities (other than for a Title VI violation), their motion to dismiss is granted.

## III. *Equal Protection Claims*

Plaintiffs assert claims under 42 U.S.C. §§ 1981, 1983, and 1985(3) alleging intentional racial discrimination in violation of their equal protection rights. Specifically, plaintiffs assert that defendants "jointly conspired to and did unlawfully, maliciously and intentionally steer a Community Residence for the mentally retarded sponsored by St. Agatha to be established and relocated to 1 Shore View Circle" for racially discriminatory reasons. (Am.Compl. ¶ 27; *see also id.* ¶¶ 304–05.)

■ Section 1983 provides a cause of action for persons deprived of their constitutional or statutory rights under color of state law. *See* 42 U.S.C. § 1983; *Kalina v. Fletcher*, — U.S. —, —, 118 S.Ct. 502, 506, 139 L.Ed.2d 471 (1997). Section 1985(3) makes actionable a conspiracy whose purpose is to deprive any person or class of persons of the equal protection of the laws. *See* 42 U.S.C. § 1985(3); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). Section 1981 provides that all persons shall have the same right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and properties as is enjoyed by white citizens...." 42 U.S.C. § 1981(a); *see also General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

■ In order to prevail under these statutes, plaintiffs must establish purposeful or intentional discrimination. *See Bray*, 506 U.S. at 268–69 (42 U.S.C. § 1985(3)); *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (42 U.S.C. § 1981); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (42 U.S.C. § 1983). The racial animus must have been a "motivating factor" behind the challenged conduct. *See Bray*, 506 U.S. at 265–66; *United States v. Yonkers*, 96 F.3d 600, 611–12 (2d Cir.1996). Discriminatory intent "implies more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,'

---

2. In addition, neither a state agency nor an official of that agency sued in his or her official capacity is a "person" under 42 U.S.C. § 1983.

*See Hafer v. Melo*, 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Spencer*, 139 F.3d 107, 111.

not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *see also Bray,* 506 U.S. at 271–72; *Eagleston v. Guido,* 41 F.3d 865, 878 (2d Cir.1994).

■ The Amended Complaint, including some 600 pages of annexed exhibits, simply does not allege facts that would support a reasonable inference of intentional racial discrimination. Instead, it puts forth unsupported accusations and conclusions of a widespread and invidious conspiracy to relocate St. Agatha's group home to plaintiffs' "minority neighborhood." As will be seen, plaintiffs' case rests solely on bald assertions and quantum leaps of inference.

In a nutshell, plaintiffs' argument is as follows. First, plaintiffs assert that at the time St. Agatha's group home was founded in 1979, the defendants entered into some kind of "unlawful agreement" whereby the Village would possess "absolute control" of the number and location of group homes in the Village. (*See* Am.Compl. ¶¶ 32–46.) Not only does plaintiffs' own evidence reveal the faults of this allegation, (*see* Exh. 5 to Am.Compl.; Village Defs.' Reply Mem. at 5–8), but the allegation itself, even if true, has no bearing on the issue of racial discrimination.

Second, plaintiffs take issue with the way in which the April 6, 1994 Padavan hearing was conducted and with the evidence on which Commissioner Maul based his decision. (*See* Am.Compl. ¶¶ 208–59.) Even assuming, *arguendo,* procedural irregularities, nothing in the Amended Complaint or the attached exhibits even remotely suggests racial motivation.

Third, plaintiffs contend—and this is what their argument really boils down to—that "the defendants knew that the Shore View Circle cul-de-sac neighborhood was the nonwhite minority isolated neighborhood of the Village of Pelham Manor white community," (Am.Compl. ¶ 301; *see also id.* ¶¶ 79, 194), and that they acted "in accordance with community pressures that they knew were racially motivated," (*id.* ¶ 184). This argument is fundamentally flawed. To begin with, plaintiffs are being less than genuine (at the very least) in describing their block as a "non-

white minority isolated neighborhood." Not only are half of the plaintiffs caucasian, but plaintiffs have chosen to exclude from their "neighborhood" two Shore View Circle addresses at which at least three additional caucasians reside. These other, white residents were among those who opposed the proposed relocation. (*See* Exh. 54 to Am. Compl.) Plaintiffs' attempt to exclude those properties on the ground that they are primarily accessed by another road and are more elevated than the other homes is spurious. Moreover, plaintiffs' own exhibits clearly reflect that Shore View Circle is not "isolated," and this one street does not constitute a "neighborhood."

Further, and more importantly, plaintiffs have alleged no facts, and have provided no evidence, from which a reasonable fact finder could conclude that any actions taken or sentiments expressed by the Pelham Manor community or any of the defendants with respect to the relocation was motivated in any way by racial animus. It may be that many residents of Pelham Manor, including village trustees, did not want a group home for the mentally retarded on their own blocks. But by no means does that assumption mean that the home was relocated to plaintiffs' street, as opposed to any other street, for racial reasons.

On the contrary, plaintiffs' own evidence strongly indicates the defendants had perfectly reasonable and benign reasons for their actions. To begin with, the Village Defendants actually *opposed* the relocation to Shore View Road. Plaintiffs' exhibits show that the Village wanted the group home to remain at a rental property, such as the James Street site, for tax purposes. Relocation of the home to One Shore View Circle, which St. Agatha intended to purchase, would mean a loss of tax revenue. This tax concern was one of the reasons the Village supported the James Street location back in 1979. (*See* Exh. 5 to Am.Compl.) Moreover, the Village Defendants fought the proposed relocation not only at its initial stages, but opposed St. Agatha in a Padavan hearing, a state court litigation, and a HUD proceeding. In addition, it was St. Agatha, and not the Village, that selected One Shore View Circle;

indeed, St. Agatha arranged to purchase the property without prior notice to or involvement by the Village. (*See* Am.Compl. ¶¶ 141–43.)

With respect to the St. Agatha Defendants, plaintiffs make much ado about the alleged falsities in the statement Ekizian submitted at the Padavan hearing. Leaving aside that the evidence cited by plaintiffs does not fully support their contention that Ekizian lied to Commissioner Maul, several of Ekizian's legitimate reasons for relocating the group home remain unchallenged (including, for example, St. Agatha's desire to own the property on .which the home would be located).

Moreover, St. Agatha desired to move *onto* plaintiffs' allegedly minority street. In light of this, plaintiffs make the outlandish claim that St. Agatha placed its group home residents in plaintiffs' assertedly "minority, non-white, isolated neighborhood" in order to "depriv[e] the mentally retarded/developmentally disabled residents from association with the white residents of the [Village]." (Am.Compl.¶ 328.) Plaintiffs' contention that St. Agatha somehow wanted to "punish" the residents of the group home by relocating them to a minority neighborhood is entirely devoid of reason, logic, or support. In short, there is absolutely nothing to suggest that the St. Agatha Defendants harbored any racial animus.

Finally, there is an equal dearth of support for plaintiffs' contention that the State Defendants were in any way racially motivated. Even assuming, *arguendo,* that there were procedural irregularities in conducting the Padavan hearing and issuing the Commissioner's report,[3] plaintiffs have alleged no facts from which racial discrimination on the part of the State Defendants could possibly be inferred.

Plaintiffs mistake the quantity of their evidence with its quality. They argue: "Any reasonable person, any ethical person, any person who values the rule of law cannot but admit that 600 pages of evidentiary material are no mere illusions and conjecture." (Pls.' Mem. in Opp. to State Defs.' & St. Agatha's

Mot. to Dismiss at 8.) On the contrary, plaintiffs' voluminous submissions provide no more evidence of intentional discrimination than would a submission of a 600–page telephone book, dictionary, or Sears catalogue. In fact, the information contained in those publications might be less damaging to plaintiffs' case than the documents they did submit, which fully support a conclusion that defendants were not racially motivated. The equal protection claims are based on a tale full of sound and fury, signifying nothing. Accordingly, defendants' motions are granted with respect to the First, Second, and Third Causes of Action.

For the same reasons, plaintiffs' equal protection claim under the New York State Constitution is also dismissed. Although, as discussed below, we dismiss all of plaintiffs' federal claims, we exercise out discretion under 28 U.S.C. § 1367(c) to retain supplemental jurisdiction over this state claim based on judicial economy and the close relationship between the federal and state equal protection claims. *See Lacoparra v. Pergament Home Ctrs., Inc.,* 982 F.Supp. 213, 225 (S.D.N.Y.1997); *Aquinas v. Federal Express Corp.,* 940 F.Supp. 73, 79 (S.D.N.Y.1996). "The breadth of coverage under the equal protection clauses of the federal and state constitutions is equal." *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1317 (2d Cir.1991). Both require proof of intentional discrimination. *See Campaign for Fiscal Equity, Inc. v. State,* 86 N.Y.2d 307, 631 N.Y.S.2d 565, 573, 655 N.E.2d 661, 669 (1995). Defendants' motions are therefore granted with respect to the Seventh Cause of Action.

## IV. *First Amendment Claim*

Plaintiffs also claim that they were deprived of their right to free speech when they were denied the opportunity to speak at the Padavan hearing. However, plaintiffs have provided no support for the proposition that individual residents are entitled to speak at Padavan hearings. On the contrary, un-

---

**3.** As the Appellate Division found, plaintiffs did not even have standing to challenge these ac- tions.

der the Mental Hygiene Law only the municipality and sponsoring agency—and not individual community members—are parties to a Padavan hearing. Here, plaintiffs admit that they were permitted to present their views to the Village Board at various public meetings. (*See, e.g.,* Am.Compl. ¶ 340.) It was the Village's prerogative to assess the validity of plaintiffs' views and to have its own, official position at the Padavan hearing differ from those views. Accordingly, the defendants' motions are granted with respect to the Sixth Cause of Action.

## V. *Title VI Claim*

Plaintiffs attempt to assert a claim on behalf of the residents of St. Agatha's group home pursuant to Title VI, Section 601 of the Civil Rights Act, which prohibits recipients of federal funding from administering such grants in a racially discriminatory manner. *See* 42 U.S.C. § 2000d. Plaintiffs claim that defendants' allegedly discriminatory conduct "will negatively impact and harm [the] mentally retarded/developmentally disabled residents by isolating them from the white residents of the ... Village of Pelham Manor." (Am.Compl.¶ 326.) [4]

 Plaintiffs clearly lack standing to bring a Title VI claim on behalf of the group home residents. As a general prudential rule, a plaintiff may not claim standing to vindicate the constitutional or statutory rights of third parties. *See Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Singleton v. Wulff,* 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 643–44 (2d Cir.1988). As the United States Supreme Court has explained:

Federal courts must hesitate before resolving a controversy, even one within their constitutional powers to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.... Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them.

*Singleton,* 428 U.S. at 113–14 (internal citations omitted) *accord Duke Power Co.,* 438 U.S. at 80.

 Based on these considerations, the Supreme Court has "narrowly limited the circumstances in which one party will be given standing to assert the legal rights of another." *Id.* A plaintiff may assert a claim on behalf of third parties only where (1) the third parties have suffered an "injury in fact," (2) the plaintiff has a "close relation" to the third parties such that the plaintiff will effectively represent the third parties' interests, and (3) the third parties are hindered in their ability to protect their own interests. *See Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Joseph H. Munson Co.,* 467 U.S. at 956; *Singleton,* 428 U.S. at 114–15; *Kane,* 843 F.2d at 643–44. Here, even assuming *arguendo* that plaintiffs have met the first element (which is highly doubtful), they have not and cannot establish that their interests are closely allied with those of the group home, or that the residents of the home are unable to protect their own rights.[5] Indeed, the Court cannot

---

**4.** *See also* Am.Compl. ¶ 328 (the purported "unlawful placement in [plaintiffs'] minority, nonwhite neighborhood ... depriv[ed] the mentally retarded/developmentally disabled residents from association with the white residents of the [Village]"); Pls.' Mem. in Opp. to Mot. to Dismiss at 9 (the rights of the residents of the group home "to live in the white community in the least restrictive environment and participate in that

community [were] taken from them through agreements which catered to the discriminatory, segregative wishes of the Village of Pelham Manor").

**5.** Plaintiffs' argument that they have standing to assert a Title VI claim on behalf of the residents is based on nothing more than their physical

envision litigants less likely to serve as effective proponents of the rights of the group home's residents.

Therefore, because plaintiffs lack standing to assert a Title VI claim on behalf of the group home residents, defendants' motions are granted with respect to the Fourth Cause of Action.

## VI. *Fair Housing Act Claim*

■ Plaintiffs also put forth a claim on behalf of the group home residents under the Fair Housing Act, which generally prohibits discrimination in the sale or rental of housing. *See* 42 U.S.C. § 3604. Again, however, plaintiffs lack third-party standing for the reasons just explained. Accordingly, defendants' motions are granted with respect to the Fifth Cause of Action.

## VII. *Attorneys' Fees*

■ Pursuant to 42 U.S.C. § 1988(b), a court may, in its discretion, award reasonable attorneys' fees to the prevailing parties in a civil rights action. Where the defendants are the prevailing parties, such awards are disfavored and may be granted only if the plaintiffs' claims are "frivolous, unreasonable, or groundless." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir.1994).

■ Additionally, Rule 11 of the Federal Rules of Civil Procedure permits sanctions to be imposed on an attorney for filing a claim containing frivolous legal arguments or factual allegations utterly lacking in evidentiary support. *See O'Brien v. Alexander*, 101 F.3d 1479, 1488–90 (2d Cir.1996). Although the parties themselves are not liable under Rule 11 for legally frivolous claims, they may be

sanctioned for totally meritless factual allegations. *See Nyitray v. Johnson*, No. 96 Civ. 6150, 1998 WL 67651, at *14 (S.D.N.Y. Feb.19, 1998).

■ Although plaintiffs and their attorney have approached the line between colorable and sanctionable assertions, the Court finds that they have not crossed it. Accordingly, the request of the Village and St. Agatha Defendants for attorneys' fees or other sanctions is denied.

### CONCLUSION

For the reasons discussed above, the Court grants the Village Defendants' motion for summary judgment and the State and St. Agatha Defendants' motion to dismiss, but declines to award attorneys' fees to defendants. An appropriate judgment shall be entered by the Clerk of the Court.

SO ORDERED.

---

proximity to the group home and the mental retardation of its residents:

> "... defendants deprived the retarded [residents] of normal residential surroundings by placing them in the only minority neighborhood in the Village.... The placement in plaintiffs' neighborhood, under the circumstances presented, established a close relation between the plaintiffs and the retarded.... Further, there exist[ ] genuine obstacles on behalf of the [group home] residents ... to asserting their rights. The severe mental re-

tardation of the residents. That's what mentally retarded/developmentally disabled means. They can't protect their own rights."

(Pls.' Mem. in Opp. to Summ. J. at 21); *see also* Pls.' Mem. in Opp. to Mot. to Dismiss at 9 ("[T]he State has taken the absurd position that nothing in the complaint suggests there is a genuine obstacle to prevent the retarded residents of 1 Shore View Circle from asserting their rights! Manifestly, it's the fact of their retardation that is the genuine obstacle.")